# 14-1158-cv(L)

## 14-1161-cv(con), 14-1246-cv(con)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

PANDORA MEDIA, INC.,

*Petitioner-Appellee,*

—against—

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,

*Respondent-Appellant,*

UNIVERSAL MUSIC PUBLISHING, INC., SONY/ATV MUSIC PUBLISHING LLC, EMI MUSIC PUBLISHING,

*Intervenors-Appellants.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR PETITIONER-APPELLEE
## [REDACTED BRIEF]

---

| | |
|---|---|
| JEFFREY S. BUCHOLTZ | KENNETH L. STEINTHAL |
| ETHAN P. DAVIS | JOSEPH R. WETZEL |
| KING & SPALDING LLP | KING & SPALDING LLP |
| 1700 Pennsylvania Avenue, NW | 101 Second Street, Suite 2300 |
| Washington, DC 20006 | San Francisco, California 94105 |
| (202) 737-0500 | (415) 318-1200 |

*Attorneys for Petitioner-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pandora Media, Inc. is a publicly owned corporation. Pandora Media, Inc. has no parent corporation, and no publicly held corporation owns 10 percent or more of Pandora Media, Inc.'s stock.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION........................................................................ 1

JURISDICTION ........................................................................ 4

STATEMENT OF ISSUES............................................................ 4

STATEMENT OF THE CASE ........................................................ 5

I.     FACTUAL BACKGROUND...................................................... 5

     A.    Pandora and the Music Genome Project ................................. 5

     B.    The Performing Rights Organizations ................................... 6

     C.    ASCAP's Historical Licensing of Radio ................................. 8

     D.    Pandora's Licensing History with ASCAP ............................. 8

     E.    The Selective Withdrawals ................................................ 9

     F.    The Pandora-Sony Negotiations ........................................ 13

     G.    The Pandora-Universal Negotiations................................... 15

II.    PROCEDURAL BACKGROUND ................................................ 18

     A.    The Summary Judgment Decision ....................................... 18

     B.    The Order Setting the Final Rate......................................... 18

SUMMARY OF ARGUMENT ....................................................... 21

STANDARD OF REVIEW............................................................ 24

ARGUMENT ........................................................................... 25

I.    THE DISTRICT COURT CORRECTLY HELD THAT ASCAP'S CONSENT DECREE REQUIRES ASCAP TO LICENSE TO PANDORA "ALL OF THE WORKS IN THE ASCAP REPERTORY." ................................................... 25

A. The plain text of the decree requires ASCAP to license "all of the works" in its repertory to Pandora. ....................... 26

B. The District Court's decision does not conflict with the Copyright Act. .......................................................... 33

C. ASCAP's and the publishers' remaining arguments are meritless. ................................................................. 36

1. The history and purposes of the decree do not support the appellants' position. ................................. 36

2. The District Court's interpretation of the decree does not lead to a "drafting error." ............................. 38

3. The "grand" right, jukebox, and noncommercial broadcaster exclusions do not undermine the District Court's conclusion. .......................................... 41

4. The District Court did not violate Rule 56(f). ............. 42

D. In the alternative, the District Court's order should be affirmed because Pandora applied for a license before the selective withdrawals. ....................................... 44

II. THE DISTRICT COURT SET A REASONABLE RATE OF 1.85 PERCENT FOR EACH YEAR OF THE FIVE-YEAR LICENSE. ........................................................................ 46

A. The District Court reasonably concluded that ASCAP failed to carry its burden with respect to its proposed rates for 2013–2015. ................................................ 47

1. The District Court did not clearly err in finding that the Sony and Universal licenses were the product of coordination. ............................................. 49

2. The District Court did not clearly err in finding that Sony's and Universal's refusal to provide lists of their works that Pandora could use to take down those works put Pandora at a severe disadvantage in the negotiations. ................................... 53

B. The District Court did not err in declining to rely on ASCAP's secondary benchmarks. ........................................... 59

    1. The District Court correctly determined that the SESAC-Pandora license is not comparable. ................ 59

    2. The District Court reasonably declined to rely on licenses with Apple. .................................................... 61

C. This Court's *RealNetworks* decision does not require a rate of 2.5 percent or higher for Pandora. ............................. 64

D. The District Court did not err in declining to adopt an escalating rate. ........................................................................ 68

E. The District Court did not abuse its discretion in declining to consider agreements entered into during trial. ........................................................................................ 70

CONCLUSION ......................................................................... 72

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alden Auto Parts v. Dolphin Equip. Leasing Corp.*,
    682 F.2d 330 (2d Cir. 1982) (per curiam)..........................32

*Arista Records v. Launch Media*,
    578 F.3d 148 (2d Cir. 2009) ........................................67

*ASCAP v. MobiTV, Inc.*,
    681 F.3d 76 (2d Cir. 2012) .......................................9, 67

*ASCAP v. Showtime / The Movie Channel, Inc.*,
    912 F.2d 563 (2d Cir. 1990) ................................... passim

*Broad. Music, Inc. v. DMX Inc.*,
    683 F.3d 32 (2d Cir. 2012) ........................................38

*Broad. Music, Inc. v. Pandora Media, Inc.*,
    Nos. 13 Civ. 4037 et al., 2013 WL 6697788
    (S.D.N.Y. Dec. 18, 2013) ........................................31

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) .............................................33

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012) .......................................70

*Ermini v. Vittori*,
    758 F.3d 153, 165 n.11 (2d Cir. 2014) .............................24

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971) .....................................29

*In re Application of MobiTV, Inc.*,
    712 F. Supp. 2d 206 (S.D.N.Y. 2010) .............................60

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008).......................................29

*Meredith Corp. v. SESAC, LLC*,
    No. 1:09-cv-9177 (S.D.N.Y. filed Nov. 4, 2009) ...................7

*Scottsdale Ins. Co. v. R.I. Pools, Inc.*,
    710 F.3d 488 (2d Cir. 2013) (per curiam)..........................24

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014) ................................................................ 43

*United States ex rel. Anti-Discrimination Ctr.*
    *of Metro N.Y., Inc. v. Westchester Cnty.*,
    712 F.3d 761 (2d Cir. 2013) ............................................................ 26

*United States v. ASCAP*
    (*In re Application of Buffalo Broad., Co.*),
    No. 13-95 (WCC), 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) ....... 46, 47

*United States v. ASCAP*
    (*In re Application of Karmen*),
    32 F.3d 727 (2d Cir. 1994) .............................................................. 29

*United States v. ASCAP*
    (*In re Application of RealNetworks, Inc., Yahoo! Inc.*),
    627 F.3d 64 (2d Cir. 2010) ........................................................... 9, 64

*United States v. Broad. Music, Inc.*,
    275 F.3d 168 (2d Cir. 2001) ............................................................ 26

*United States v. Broad. Music, Inc.*,
    426 F.3d 91 (2d Cir. 2005) ...................................................... passim

*Vintero Corp. v. Corporacion Venezolana de Fomento*,
    675 F.2d 513 (2d Cir. 1982) (per curiam) ........................................ 41

**Statutes**

17 U.S.C. § 101 ................................................................................. 42

17 U.S.C. § 102 ................................................................................. 33

17 U.S.C. § 106 ............................................................................ 33, 34

17 U.S.C. § 116 ................................................................................. 42

17 U.S.C. § 118 ................................................................................. 42

17 U.S.C. § 201 ................................................................................. 33

28 U.S.C. § 1291 ................................................................................. 4

28 U.S.C. § 1331 ................................................................................. 4

**Rules & Regulations**

Fed. R. Civ. P. 56 ............................................................................... 42

## Other Authorities

ASCAP Payment System ........................................................29

ASCAP Publisher Agreements.............................................34

Comments of the American Society of Composers, Authors, and
    Publishers Regarding Review of *ASCAP* and
    *BMI* Consent Decrees (Aug. 6, 2014) ................................45

Comments of the American Society of Composers, Authors, and
    Publishers Regarding Orphan Works (Mar. 25. 2005)....................29

U.S. Department of Justice,
    Antitrust Division Opens Review of *ASCAP* and
    *BMI* Consent Decrees.......................................................32

Webster's II New Riverside Dictionary (1984) .......................................28

**INTRODUCTION**

Pandora is the largest Internet radio provider in the United States. The American Society of Composers, Authors, and Publishers ("ASCAP") is a membership association that controls the rights to nearly half of all musical compositions. Because ASCAP enjoys a "dominant position in the music licensing field" that "gives it considerable market power," *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 570 (2d Cir. 1990) ("*Showtime*"), it is subject to a consent decree that imposes restrictions on its licensing activities.

As relevant here, the decree requires ASCAP, upon a music user's request, to grant a license to perform "all of the works in the ASCAP repertory." AFJ2 § VI (SPA-7). It also allows ASCAP or a licensee to seek a judicial determination of a "reasonable fee" for a license to perform all of the works in ASCAP's repertory. When setting a rate, "the appropriate analysis ordinarily seeks to define a rate or range of rates that approximates the rates that would be set in a competitive market." *Showtime*, 912 F.2d at 576. The rate court must "take seriously the fact that [it] exist[s] as a result of monopolists exercising disproportionate

1

power over the market for music rights." *United States v. Broad. Music, Inc.*, 426 F.3d 91, 96 (2d Cir. 2005) ("*Music Choice IV*").

Intervenors Sony and Universal ("UMPG") are major publishers that together control about half of the musical works in the United States. They thus wield similar market power to ASCAP. For decades, both have been members of ASCAP. Indeed, through seats on ASCAP's Board, Sony and Universal have exerted significant control over ASCAP. Recently, these publishers (and others) have begun to chafe at the consent decree's restrictions and the rates set by the court for so-called "new-media" users like Pandora. Sony and Universal thus sought to selectively withdraw from ASCAP by purporting to prohibit ASCAP from licensing their works to users like Pandora, while leaving their works in the ASCAP repertory for licensing to other users.

After Sony and Universal selectively withdrew from ASCAP, Pandora was forced to negotiate with them for direct licenses. Their large market shares ensured that Sony and Universal would negotiate from a position of strength, but they left nothing to chance. Despite repeated requests, both Sony and Universal refused to provide Pandora with a list of their works that Pandora could use, if an agreement could not be

2

reached, to take the works down from its service. The publishers thus forced Pandora to "choose" either to agree to direct licenses at high rates, shut down its service entirely, or incur crippling copyright infringement liability. The selective withdrawal scheme allowed Sony and Universal, entities with "outsize" and "considerable market power" (SPA-148, 173), to force Pandora into licenses at supracompetitive rates—precisely the result the decree was designed to prevent.

The District Court correctly recognized this point in both of the rulings that ASCAP, Sony, and Universal challenge on appeal. First, the court concluded that the selective withdrawal scheme was inconsistent with the consent decree. As the court noted, the decree means what it says: ASCAP must grant a license to perform "*all* of the works in the ASCAP repertory," not just *some* of them, and Sony's and Universal's works remained in ASCAP's repertory.

Second, the court set a rate of 1.85 percent of revenue for Pandora's 2011–2015 license, rejecting ASCAP's claim that the much-higher rates in the Sony and Universal direct licenses were appropriate benchmarks. The court carefully explained why a 1.85 percent rate is consistent with relevant benchmark licenses. That rate tracks the 1.85

3

percent rate that ASCAP accepted from Pandora for years and that Pandora negotiated with EMI for 2012–2013. And it is broadly consistent with (though somewhat higher than) the 1.70 percent rate paid by most terrestrial radio stations for traditional and new-media performances.

The District Court's decisions should be affirmed.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331 because the proceeding that gave rise to the consent decree arose under the antitrust laws. The court retained jurisdiction over the rate proceeding under Section IX of the decree. This Court has jurisdiction to review the court's final judgment under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. ASCAP's consent decree requires ASCAP "to grant to any music user making a written request therefor a non-exclusive right to perform all of the works in the ASCAP repertory." AFJ2 § VI (SPA-7). Pandora sought a license to perform all of the works in the ASCAP repertory. Must ASCAP license all of the works in its repertory to Pandora, or may it license only some of the works in its repertory?

4

2.     Pandora and EMI agreed to a 1.85 percent of adjusted revenue rate in 2012, BMI agreed to renew its 1.75 percent rate with Pandora at the end of 2011, and ASCAP agreed in 2012 to license the broadcast radio industry—including their internet radio businesses—at a rate of 1.7 percent for 2010–2016.  In light of these marketplace agreements and ASCAP's concession that 1.85 percent was reasonable for 2011 and 2012, did the District Court clearly err in setting a 1.85 percent rate for Pandora for 2011–2015?

## STATEMENT OF THE CASE

### I.   Factual Background

### A.     Pandora and the Music Genome Project

Launched in 2005, "Pandora is the most successful Internet radio service operating in the United States today."  SPA-100; *see also* JA-2748, JA-2824.  Approximately 70 million people actively listen to Pandora.  SPA-100; JA-2748.

Pandora's popularity is attributable to its investment in its propriety Music Genome Project.  SPA-100; JA-2747–48.  The Music Genome Project predicts the types of songs users like to hear and uses individual feedback and the collective feedback amassed from over 30 billion responses to improve its song-matching algorithm.  JA-2768.

5

This enables Pandora to deliver a radio-listening experience to users that they are likely to enjoy. Because listeners cannot choose to listen to individual songs, however, Pandora is not an "on-demand" or "interactive" music service. SPA-114.

### B. The Performing Rights Organizations

ASCAP "is an unincorporated membership organization of music copyright holders created and controlled by music writers and publishers." SPA-87; JA-4069. Writers and publishers give ASCAP the right to license non-dramatic public performances of their compositions. ASCAP then licenses those works "to a broad array of music users," including radio stations and digital music services. SPA-88.

Collective licensing through ASCAP is efficient for both music users and copyright holders. Rather than negotiate with each copyright holder individually, a "music user can license an enormous portfolio of copyrighted music through the execution of a single license" with ASCAP. SPA-88. ASCAP competes for members with two other performing rights organizations: Broadcast Music, Inc. ("BMI") and SESAC, LLC ("SESAC"). SPA-89; JA-1773.

Although collective licensing creates efficiencies, it also raises antitrust concerns. In 1941, the Department of Justice brought an antitrust lawsuit against ASCAP that resulted in the entry of a consent decree that continues to govern ASCAP. SPA-89-90; JA-30. BMI operates under a similar consent decree. SESAC—by far the smallest performing rights organization—does not operate under a consent decree, JA-2858, though it recently settled one of two antitrust suits against it. *Meredith Corp. v. SESAC, LLC*, No. 1:09-cv-9177 (S.D.N.Y. filed Nov. 4, 2009), Docs. 173, 174.

The ASCAP decree (also known as the "Second Amended Final Judgment," or "AFJ2") imposes a number of requirements. As relevant here, ASCAP must, upon a music user's request, grant a license to perform "all of the works in the ASCAP repertory." AFJ2 § VI (SPA-7). When publishers elect to join ASCAP, they "agree to be bound in the exercise of their copyright rights by the terms of AFJ2." SPA-90.

If ASCAP and an applicant cannot agree on a rate for a license, the decree requires the court retaining jurisdiction over the decree to determine a reasonable rate. SPA-90. Either party may petition this "rate court" to set a reasonable rate. AFJ2 § IX(A) (SPA-10). "[T]he

burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks." *Id.* § IX(B) (SPA-10). If ASCAP fails to carry its burden, the court "shall determine a reasonable fee based on all the evidence." *Id.* § IX(D) (SPA-11).

### C. ASCAP's Historical Licensing of Radio

"Much of the radio industry obtains its license for the public performance of ASCAP music through the [Radio Music License Committee (the "RMLC")], which is a trade association that represents the commercial radio industry." SPA-96. In 2011, the RMLC and ASCAP agreed on a license with a rate of 1.70 percent of all revenue, including revenue derived from new media uses. SPA-98; JA-1796. Notably, the 1.70 percent rate applies to terrestrial broadcasting and "also to programmed and customized internet radio stations owned by RMLC members." SPA-98–99; JA-1178–80. The rate remains constant throughout the seven-year license.

### D. Pandora's Licensing History with ASCAP

In 2005, Pandora accepted the ASCAP form license agreement for "Internet Sites and Services—Release 5.0." SPA-107; JA-126. The license called for a rate of 1.85 percent of Pandora's revenue. JA-127.

8

In October 2010, Pandora exercised its option to terminate the form license. SPA-107; JA-127.

Invoking the decree, Pandora applied for a new license for January 1, 2011 through December 31, 2015. SPA-110. Upon applying, Pandora obtained the right to publicly perform all of the compositions in the ASCAP repertory for that license term, "with only the proper payment rates to be determined, either through negotiation or by the rate court." SPA-111. In an effort to avoid resorting to the rate court, Pandora negotiated with ASCAP. JA-127.

### E. The Selective Withdrawals

While the negotiations between ASCAP and Pandora unfolded, ASCAP and certain major publishers engaged in an unprecedented scheme. Frustrated by the rate court's and this Court's refusal to approve substantial rate hikes for new media services (*see, e.g.*, *ASCAP v. MobiTV, Inc.*, 681 F.3d 76 (2d Cir. 2012); *United States v. ASCAP* (*In re Application of RealNetworks, Inc., Yahoo! Inc.*), 627 F.3d 64 (2d Cir. 2010)), the publishers began considering withdrawing from ASCAP. *See* JA-1821. In September 2010, publisher EMI informed ASCAP that it was considering withdrawing.

9

"Spurred by the potential loss of one of the four largest music publishers, ASCAP began in 2010 to explore a proposal to amend its Compendium to allow members to withdraw from ASCAP only the right to license works to new media users." SPA-116; JA-4035. The proposal created tension between the major publishers and individual songwriters. The songwriters trusted ASCAP to account for their revenues and distribute them quickly and promptly, and worried "about the loss of transparency in these functions if publishers took over the tasks of collection and distribution of licensing fees." SPA-119; JA-1301.

Aware of the songwriters' discomfort, the publishers tried to enlist their support by arguing that "if the major publishers could get higher license rates by direct negotiations with new media companies outside of ASCAP then those rates could be used in rate court litigation to raise the ASCAP license fees." SPA-122. ASCAP Chairman Williams agreed, claiming that the direct licenses "will set a higher market price which will give us bargaining power in rate court." SPA-122; JA-3968–69.

In April 2011, ASCAP's Board modified its Compendium to permit members (on six months' notice) to selectively withdraw "from ASCAP the right to license the right of public performance of certain New

[M]edia Transmissions." SPA-123–24; JA-270; JA-4075–79. "The Compendium modification also allowed the withdrawing publishers to rejoin ASCAP at any point, eliminating any risk to the publisher if a withdrawal proved to be a bad idea." SPA-125; JA-4075–79.

Days later, EMI announced that it had withdrawn new media rights from ASCAP. SPA-126; JA-127; JA-270–73. Pandora began to negotiate a direct license with EMI. SPA-130; JA-128. The negotiations were collegial "and the contours of the license were quickly settled." SPA-130. The parties agreed on a rate of 1.85 percent of revenue for January 1, 2012 to December 31, 2013, the same headline rate in Pandora's prior license with ASCAP. SPA-130; JA-128.

Meanwhile, Pandora continued to negotiate with ASCAP. In September 2011, Pandora and ASCAP executed an interim license agreement based on the form license rate of 1.85 percent. SPA-133. In September 2012, Pandora learned that Sony (after acquiring EMI)[1] was planning to selectively withdraw from ASCAP effective January 1, 2013. SPA-133; JA-128–29. Sony had notified ASCAP of its planned

---

[1] In 2012, a group led by Sony/ATV Music Publishing LLC acquired EMI Music Publishing. This brief refers to Sony and EMI collectively as "Sony."

11

withdrawal over a year earlier, but both Sony and ASCAP withheld that information from Pandora. SPA-133; PX-268; PX-269.

Because Sony's withdrawal was mere weeks away and others could follow suit, Pandora filed its rate court petition. SPA-133. Pandora's filing angered the major publishers, SPA-133, which responded by interfering with the negotiations between ASCAP and Pandora. After conferring with a lawyer at the firm that was then representing Pandora, Universal CEO Horowitz wrote to ASCAP Chairman LoFrumento, advising him that Pandora's lawyers and Pandora "are scared" and that ASCAP should "be strong" and "really push Pandora." SPA-134; JA-3950. Horowitz forwarded this message to each of the heads of the other major publishers on ASCAP's Board of Directors. JA-3950–62. All the while, Horowitz knew (but had not told ASCAP) that Universal intended to selectively withdraw from ASCAP. JA-1513; PX-283.

The negotiations between Pandora and ASCAP continued. Based on ASCAP's rules and what ASCAP negotiators had communicated to Pandora, Pandora understood that if it reached a license agreement with ASCAP before the end of 2012 when Sony's selective withdrawal would take effect, the license would include Sony's (and any other later-

12

withdrawing publishers') works for the duration of the license. SPA-135. With that motivation, "[b]y the end of November, Pandora believed that it had reached an agreement on terms with ASCAP, although it understood that the agreement needed final approval from ASCAP." SPA-135; JA-2802.

On December 14, however, LoFrumento rejected the license that his staff had negotiated with Pandora. SPA-135; JA-2802. He did so in part because "Sony had threatened to sue ASCAP in the event any license agreement with Pandora that encompassed the Sony repertoire was executed before the end of 2012." SPA-135; JA-3409–10.

### F. The Pandora-Sony Negotiations

When ASCAP rejected the license with Pandora, less than three weeks remained before the end of 2012 and Sony's impending selective withdrawal. That posed a huge problem for Pandora. If Pandora could not remove the sound recordings embodying Sony's works from its service by January 1 or enter into a direct license with Sony, it would face crippling copyright infringement liability. SPA-139; JA-2809.

Sony, ██████████████████████████ JA-1820, "promptly set the tenor for the negotiations with a not-too-veiled threat," SPA-139,

as Sony's Peter Brodsky stated "[i]t's not our intention to shut down Pandora."  SPA-139; JA-1476.  Brodsky then demanded a massive hike in Pandora's license fees.  SPA-140; JA-1821–22.

Facing the possibility that it might not be able to reach an agreement with Sony, Pandora "requested a list of the Sony catalog so that it could take the Sony works off, or at least threaten to take them off, of the Pandora service if no deal could be reached."  SPA-141.  Pandora requested the list for the first time on November 1, 2012.  SPA-141; JA-2808; JA-3598.  Brodsky received the request but did not respond.  SPA-141; JA-2372; JA-2808.  Pandora repeated the request several times during November, but received no response.  SPA-141; JA-4492–95.

After ASCAP rejected the deal with Pandora on December 14, Pandora made two more urgent requests for the list of Sony's works: one to Sony and one to ASCAP.  SPA-143; JA-2809.  "Not wishing to empower Pandora, Sony never responded."  SPA-143.  Sony also ignored ASCAP's request for permission to provide the list to Pandora.  SPA-145.  So although it "would have taken ASCAP about a day to respond to Pandora's request with an accurate list of the Sony works . . .

14

ASCAP, like Sony, stonewalled Pandora and refused to provide the list." SPA-144.

"The terms of the Pandora license with Sony were negotiated in four business days during the single week that ran between ASCAP's rejection of the Pandora term sheet and the start of the holiday break." SPA-145–46. Sony insisted on an implied ASCAP rate of 2.28 percent, which was a 25 percent increase in Pandora's royalty rate. SPA-146; JA-2811. In March 2013, "Sony's [Marty] Bandier bragged that Sony had leveraged its size to get this 25% increase in rate." SPA-146. The parties executed a confidentiality agreement, but Sony had already "leaked the key terms of the Pandora license to the press." SPA-147; JA-2812. One headline read: "Sony/ATV 'Now Has the Power to Shut Pandora Down.'" SPA-147–48.

## G. The Pandora-Universal Negotiations

Encouraged by Sony's success, Universal decided to selectively withdraw from ASCAP effective July 1, 2013. SPA-149; JA-2812. Pandora thus sought to negotiate with Universal for a direct license. Universal was one of the largest publishers, owning or controlling ███ ████ of the market. JA-4701.

Pandora's negotiations with Universal "were even more conten-
tious" than those with Sony. SPA-149. In their first substantive meet-
ing, Horowitz "uttered what [Pandora CEO] Kennedy took to be an
implicit threat. Horowitz said 'we want Pandora to survive.'" SPA-150;
JA-1612. Horowitz relied on the license terms that Sony had extracted
to justify a substantial hike in Pandora's royalties. "Showing confidence
that he knew the material terms of the Sony-Pandora license, Horowitz
repeatedly asked Kennedy, (as Kennedy paraphrased) 'how did you get
Marty [Bandier] at Sony to agree to such a low payment?'" SPA-151;
JA-3599.

Universal initially demanded a headline rate of 8 percent (from
which Universal would receive its pro-rata share). SPA-149; JA-2813.
Pandora's lawyer "was aghast. He told Horowitz that in his 20 years in
the music industry he had never encountered a situation in which a
licensor suggested that rates should effectively double overnight, going
from 4% to 8%." SPA-152. Horowitz bluntly responded that "Pandora
did not have much negotiating leverage." SPA-153.

Fearing that it might have to take down Universal's works if a
deal could not be reached, Pandora requested a list of Universal's

16

works.  SPA-151; JA-2813.  Universal eventually supplied a list (SPA-153; JA-2813), but on terms that prevented Pandora from using the list "for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the Parties."  SPA-154; JA-4316.  "Pandora correctly interpreted this provision as forbidding it from using the list to remove the UMPG works from its service."  SPA-154.

Believing that Universal's proposal was unreasonable, Pandora switched gears and moved for partial summary judgment in the rate court, contending that the selective withdrawals could "not affect the scope of the ASCAP repertoire subject to Pandora's application for an ASCAP license."  SPA-155.

Pandora and Universal then reached agreement on a six-month license agreement at a rate of 7.5 percent (an implied ASCAP rate of 3.42 percent).  SPA-156; JA-2814.  The agreement was contingent on, among other things, the outcome of Pandora's summary judgment motion, providing that it would "be of no further force or effect" if the court ruled (in a "final decision not subject to any further appeal") that the selective withdrawals were impermissible.  SPA-156; JA-2814.

## II. Procedural Background

### A. The Summary Judgment Decision

The District Court granted Pandora's motion, concluding that the consent decree "required each work that was in the ASCAP repertoire to be available to any user who requested a blanket license." SPA-157. Then, the court granted the publishers' motion to intervene *nunc pro tunc* for purposes of appeal. SPA-157.

### B. The Order Setting the Final Rate

At trial, ASCAP proposed a rate of 1.85 percent of revenue for 2011 and 2012, with the rate increasing to 2.50 percent in 2013 and 3.0 percent in 2014 and 2015. ASCAP relied principally on the EMI, Sony, and Universal direct licenses with Pandora, offering Pandora's license with SESAC and ASCAP's licenses with Apple as confirmatory benchmarks.

Pandora contended that the 1.70 percent rate in the ASCAP-RMLC license was appropriate for all five years of the license, and argued that in no event should the rate be higher than the 1.85 percent-of-revenue rate ASCAP had accepted from Pandora for years. Both parties agreed that the 1.85 percent rate in the Pandora-EMI license

18

represented a reasonable rate (in ASCAP's case, for 2011-2012; in Pandora's case, as the upper bound of the range of reasonableness).

The court set a rate of 1.85 percent for the period 2011–2015. Because ASCAP and Pandora agreed that 1.85 percent was within the range of reasonable rates for 2011 and 2012, the court saw no reason to engage in further analysis for that period. SPA-169.

As for 2013–2015, the court found that ASCAP failed to show that the Pandora-Sony and Pandora-Universal licenses were appropriate benchmarks. SPA-173. The court explained that Sony and Universal, ███████████████████████████████████████████████████, "each exercised their considerable market power to extract supra-competitive prices." SPA-173; JA-3449; JA-4701. Moreover, "the evidence at trial revealed troubling coordination between Sony, UMPG, and ASCAP, which implicates a core antitrust concern underlying AFJ2 and casts doubt on" whether the licenses were the product of a competitive market. SPA-173–74 (citing *Music Choice IV*, 426 F.3d at 95). The court also suggested that the "contingent" nature of the Universal license made it a poor benchmark.

The court further declined to rely on the SESAC and Apple licenses. It concluded that SESAC licenses historically are of limited value because the public knows little about the size of the SESAC repertory, and that the revenue base for the Apple licenses was not comparable to Pandora's. The court also rejected the testimony of ASCAP's principal expert, Dr. Murphy, noting that his "theory comes undone when applied to the real world." SPA-192.

Having rejected ASCAP's benchmarks, the court turned to the ASCAP-RMLC license that Pandora had advanced as a benchmark. The court found that Pandora's service was "indistinguishable for licensing purposes" from the "customized radio offerings by RMLC members Clear Channel and CBS," that "it is radio," and that it competes with terrestrial radio for listeners and advertising dollars. SPA-207–08. Although the question was "close," the court nevertheless decided that Pandora was not entitled to the 1.70 percent RMLC rate. SPA-210. The court set a 1.85 percent rate for 2013–2015.

ASCAP, Sony, and Universal appealed.

## SUMMARY OF ARGUMENT

1.　　Sony and Universal purported to selectively prohibit ASCAP from licensing their works in the ASCAP repertory to certain "new media" users like Pandora.  Their works, however, remained in the ASCAP repertory and thus could be licensed to all other music users. The District Court correctly concluded that this scheme is inconsistent with the plain text of ASCAP's consent decree.

As the court recognized, the decree unambiguously requires ASCAP to grant, upon request by "any music user," a license to perform "all of the works in the ASCAP repertory."  The decree does not permit ASCAP to limit the license it will grant to selected music users to merely *some* of the works in its repertory.  ASCAP may be able to charge higher rates to certain types of music users, subject to the rate court's review.  But ASCAP may not refuse to deal with selected music users; if a work is in ASCAP's repertory, it must be available for licensing to "any music user."

The meaning of the term "work" confirms that the court was correct.  Under Section II(U) of the decree, a "work" is "any copyrighted musical composition."  It is not a bundle of divisible performance rights

21

as to a given composition. Dictionaries, this Court's case law, and ASCAP's own historical usage of the term "work" point in the same direction. The works that Sony, Universal, and ASCAP attempted to prevent Pandora from licensing remained "in the ASCAP repertory." If it were otherwise, ASCAP could not have licensed Sony's and Universal's works to other users.

The court correctly rejected appellants' arguments that enforcing the plain meaning of the decree conflicts with the Copyright Act. A publisher, on its own, may choose to license its work as it sees fit, including by licensing certain kinds of performance rights to certain kinds of users and not others. But a publisher that joins ASCAP accepts the restrictions that antitrust law imposes on ASCAP. Sony and Universal exercised their Copyright Act rights by choosing to join ASCAP, presumably because they believed that the benefits of membership outweigh the costs of abiding by the decree's restrictions. Copyright law permits them to withdraw from ASCAP if they change their minds and decide that the terms of membership are more bitter than sweet, but it does not permit them to change the terms of the consent decree.

2.    The District Court did not clearly err in setting a rate of 1.85 percent for each year of Pandora's ASCAP license.  That rate tracks the rate that Pandora negotiated with EMI, itself a benchmark proposed by ASCAP.  ASCAP claims that the court improperly declined to rely on the Sony and Universal direct licenses to sharply increase Pandora's rate over the five-year license term.  But the record supports the court's factual findings that those licenses were the product of coordination between ASCAP and the publishers and in any event did not reflect the rate that would prevail in a competitive market.

For example, as the court found, Sony and Universal refused to provide lists of their works that would have allowed Pandora to remove (or threaten to remove) their content from its service.  That forced Pandora into an untenable situation: either agree to supracompetitive rates, shut down its service entirely, or incur crippling copyright infringement liability.  Rates that Pandora accepted with a boot on its throat are not arm's-length rates.

The court also properly declined to rely on ASCAP's secondary benchmarks: the Pandora-SESAC and ASCAP-Apple licenses.  It explained why the 2.5 percent Music Choice rate was not appropriate for

23

Pandora. And the court correctly refused to adopt ASCAP's proposal for an escalating rate, noting that to do so would have been out of step with ASCAP's own historical and current practices. Finally, the court acted well within its discretion in refusing ASCAP's request to reopen discovery in the middle of trial.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Scottsdale Ins. Co. v. R.I. Pools, Inc.*, 710 F.3d 488, 491 (2d Cir. 2013) (per curiam). The Court "review[s] the rate set by the District Court for reasonableness." *Music Choice IV*, 426 F.3d at 96. The court must determine "that the rate is substantively reasonable (that it is not based on any clearly erroneous findings of fact) and that it is procedurally reasonable (that the setting of the rate, including the choice and adjustment of a benchmark, is not based on legal errors)." *Id.* This is a deferential standard of review: "Whether [the court of appeals], in the district court's shoes, would have adopted these factual findings is irrelevant." *Ermini v. Vittori*, 758 F.3d 153, 165 n.11 (2d Cir. 2014).

ASCAP misleadingly asserts that the "[f]ailure to utilize properly available benchmark agreements in determining a reasonable license

fee is legal error reviewable *de novo*." Br. 28. Although the court's legal conclusions made in the process of identifying an appropriate benchmark are reviewed *de novo*, this Court "review[s] the District Court's evaluation of the facts surrounding the formation of the benchmark agreements, including the credibility of witnesses and other evidence at trial, for clear error." *Music Choice IV*, 426 F.3d at 96.

## ARGUMENT

### I. The District Court correctly held that ASCAP's consent decree requires ASCAP to license to Pandora "all of the works in the ASCAP repertory."

The selective withdrawal scheme was designed to accomplish what the consent decree is supposed to prevent. Sony and Universal withdrew from ASCAP, but only with respect to new-media users like Pandora. Despite having lists of their works readily available, Sony refused to provide such a list and Universal provided a list that Pandora could not use to take down Universal's works. Sony and Universal thus forced Pandora to agree to direct licenses at above-market rates. The selective withdrawals produced "excessive fee demands" and publishers acting as "monopolists exercising disproportionate power over the market for music rights" (*Music Choice IV*, 426 F.3d at 96)—precisely the evils the decree was supposed to prevent.

25

**A.    The plain text of the decree requires ASCAP to license "all of the works" in its repertory to Pandora.**

"Consent decrees reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable." *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 712 F.3d 761, 767 (2d Cir. 2013) (internal quotation marks omitted).  Under those rules, "[w]hen the language of a consent decree is unambiguous, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (internal quotation marks omitted).

Although ASCAP and the intervenors assemble a hodgepodge of arguments, the elephant in the room is the text of the decree.  As the District Court concluded, "the language of the consent decree unambig-uously requires ASCAP to provide Pandora with a license to perform all of the works in its repertory."  SPA-21 (referring to Section VI).  Be-cause Pandora requested a license to perform "all" of the works in ASCAP's repertory, the decree "mandate[s] that Pandora's license to perform ASCAP compositions during the five year term of its license

extends to 'all' of ASCAP's repertory and is unaffected by any new media licensing rights withdrawals by ASCAP publishers." SPA-36.

Unable to dispute that "all" means "all," ASCAP and the intervenors lean on the decree's definition of "ASCAP repertory." That definition, however, confirms the court's conclusion. It specifies that "'ASCAP repertory' means those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time." AFJ2 § II(C) (SPA-2). As the court explained, "Section II(C) does not define 'ASCAP repertory' in terms of rights held by ASCAP to license works to particular classes of licensees." SPA-33. Rather, if a publisher has granted to ASCAP the right to license a particular work to anyone, that work is in the ASCAP repertory because ASCAP has the "right to license" it.

Accordingly, "the natural reading of Section II(C)'s definition of 'ASCAP repertory' as consisting of 'works the right of performance ASCAP has . . . the right to license' is that it means that the ASCAP repertory consists of works the right to which ASCAP has the ability to license at all." SPA-33. If the content of the ASCAP repertory varied

depending on the identity of the music user, the decree would refer to "repertories," not a single repertory.

The decree's definition of "work" further confirms this conclusion. "Work" means "any copyrighted musical composition." SPA-34 (citing AFJ2 § II(U) (SPA-5)). That definition reflects "ordinary usage," where "the word 'work' in the musical context means a composition and not a right in a composition." SPA-34. *See also* Webster's II New Riverside Dictionary 1327 (1984) (defining "work" as "[s]omething that has been done, made, or performed as a result of one's occupation, effort, or activity"). "Because 'works' in AFJ2 means 'composition[s]' and not 'rights in compositions', and because it is undisputed that . . . ASCAP . . . retain[s] the right to license the works of the withdrawing publishers for non-new Media purposes, those compositions remain 'works in the ASCAP repertory' within the meaning of Sections VI and IX(E) of AFJ2." SPA-35.

The court's interpretation of "ASCAP repertory" also is consistent with this Court's decisions, which have "employed the term 'repertory' in reference to compositions and not rights in compositions." SPA-33. *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d

28

290, 321 (2d Cir. 2008) ("[U]sers want . . . access to any and all of the repertory of *compositions*") (emphasis added) (internal quotation marks omitted); *United States v. ASCAP* (*In re Application of Karmen*), 32 F.3d 727, 728 (2d Cir. 1994) ("ASCAP, with three million *songs* in its repertory") (emphasis added); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1160 (2d Cir. 1971) (discussing "musical *compositions* in the ASCAP repertory") (emphasis added).

Outside of this case, ASCAP itself understands that a work is a work, not a bundle of divisible rights. It has referred to its "repertory of millions of copyrighted musical works." Comments of the American Society of Composers, Authors, and Publishers Regarding Orphan Works at 1 (Mar. 25. 2005), *available at* http://www.copyright.gov/orphan/comments/OW0628-ASCAP.pdf (Mar. 25. 2005). And, to this day, ASCAP's website informs copyright holders that "[o]nce you've registered your works with ASCAP, they become part of the ASCAP repertory." ASCAP Payment System, *available at* http://www.ascap.com/members/payment/whocollect.aspx.

ASCAP also contends that the "District Court's 'all or nothing' approach cannot be reconciled with Sections IV(E) and IV(F) of AFJ2

(SPA-5–6), which permit ASCAP to license works to certain users and not to others." Br. 35–36. But Sections IV and VI coexist without any tension. Section IV(E) bans ASCAP from granting licenses to "motion picture theater" exhibitors (AFJ2 § IV(E) (SPA-5–6)), which is a limited, categorical exception that has nothing to do with this case.

Likewise, Section IV(F) permits ASCAP to restrict performances of a work when instructed by a user and when necessary "to protect . . . the value of the public performance rights therein" (AFJ2 § IV(F) (SPA-6)). Under this section, a user may prevent a work from being performed in a pornographic film or in another manner that would reduce its value. This section has no conceivable application here, where the court found that the evidence "suggests that Pandora is promotional" (SPA-199)—*i.e.*, that performances on Pandora increase rather than cannibalize music sales.

So what Section VI grants (a license to perform all the works in the ASCAP repertory), Section IV takes away in certain specified and limited situations. These narrow provisions relating to what ASCAP is prohibited from doing (Section IV, "Prohibited Conduct") do not trump the plain language of the licensing section requiring ASCAP to license

30

all of the works in its repertory upon request by any music user (or the plain language of the definition of "ASCAP repertory" making clear that it consists of "works"). If anything, the absence of a provision in Section IV allowing a user to instruct ASCAP not to license works to new media users cuts against ASCAP's position. *See also* AFJ2 § II(H) (distinguishing between "[o]n-line music user[s]" and other music users for certain purposes unrelated to the obligation to license all works in the repertory to any music user).

In another attempt to defeat the decree's clarity, BMI's amicus brief contends that "the conflicting decisions of the ASCAP and BMI rate courts demonstrate that the language of the consent decrees is not clear and unambiguous." BMI *Amicus* Br. 17 (capitalization omitted). But the *BMI* court *agreed* with the court here about the core interpretation of the decree, holding that selective withdrawals are impermissible because the BMI decree "requires that all compositions in the BMI repertory be offered to all applicants." *Broad. Music, Inc. v. Pandora Media, Inc.*, 2013 WL 6697788, at *3 (S.D.N.Y. Dec. 18, 2013).[2]

---

[2] While the *BMI* court agreed with the court here that the attempted selective withdrawals were improper, the courts differed as to the effect

ASCAP implies that the Department of Justice blessed the selective withdrawals (*see* Br. 15), but that is quite untrue. During the *BMI* proceedings, the United States unequivocally expressed its agreement with Judge Cote's interpretation of the decree. *See* Tr. Oral Arg. 45:4–5 (Dec. 18, 2013) ("Judge Cote was right.").[3]

---

of that impropriety. The *BMI* court held that the purported selective withdrawals should be treated as *full* withdrawals, meaning that BMI cannot license Sony's or Universal's works to any music user. *Id.* at *4. No party in that case or here advocated for that result, and for good reason. The publishers and the performing rights organizations entered into two sets of agreements: the original membership agreements and the partial withdrawals. While Judge Cote's remedy preserved the parties' intent as much as possible by giving effect at least to the original agreements, Judge Stanton threw both sets of agreements out altogether. The better course is to invalidate the modification agreements either because they place ASCAP and BMI in violation of their consent decrees (as Judge Cote implied), or because they are the product of mutual mistake about the permissibility of selective withdrawals. *See, e.g., Alden Auto Parts v. Dolphin Equip. Leasing Corp.*, 682 F.2d 330, 333 (2d Cir. 1982) (per curiam).

[3] The Department of Justice recently announced that it is opening a review of the ASCAP and BMI consent decrees, which specifically requests comments on whether they should "be modified to allow rights holders to permit ASCAP or BMI to license their performance rights to some music users but not others." *See* Antitrust Division Opens Review of *ASCAP* and *BMI* Consent Decrees, *available at* http://www.justice. gov/atr/cases/ascap-bmi-decree-review.html. The need for a decree amendment to permit selective withdrawals further confirms that the decree prohibits them. The ongoing review also suggests that this Court should preserve the status quo interpretation of the decree and

**B.    The District Court's decision does not conflict with the Copyright Act.**

ASCAP and the intervenors also contend that the District Court's decision cannot be reconciled with the Copyright Act's grant of exclusive, divisible rights to copyright holders. *See* ASCAP Br. 34–35 (citing 17 U.S.C. §§ 106, 201).  That is incorrect.

The Copyright Act refers to "works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  The court noted that "[t]his definition is inconsistent with a reading of works that defines the word in terms of 'rights.'"  SPA-35.  Moreover, the Supreme Court has referred to a "work" as the "translat[ion] [of] an idea into a fixed, tangible expression."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *see also* SPA-35.  Rights in compositions cannot be placed into "a fixed, tangible expression," but the compositions themselves can.

Nor did the court's decision deprive the publishers of their exclusive rights under Section 106 of the Copyright Act.  That section grants

---

await the conclusion of DOJ's review and any proceedings it may lead to.

exclusive rights to the "owner of a copyright" to, among other things, reproduce the copyrighted work, publicly perform the copyrighted work, and distribute the copyrighted work to the public. 17 U.S.C. § 106. ASCAP's protest that "no one can force copyright owners to license their works," Br. 34, is misplaced, because no one has forced anyone to license any works. Sony and Universal voluntarily chose to join ASCAP and put the works under their control in ASCAP's repertory.

When a publisher *chooses* to participate in ASCAP, the publisher becomes subject to the consent decree. ASCAP's form publisher agreement requires the applicant to represent that it "has read the . . . [consent decree] and agrees to be bound by [it]." ASCAP Publisher Agreements at 1, *available at* http://www.ascap.com/~/media/files/pdf/join/ascap-publisher-agreement.pdf. And the decree itself specifies that its provisions apply "to ASCAP . . . *and to all other persons in active concert or participation with [it]*." AFJ2 § III (SPA-5) (emphasis added). As the court understood, "the Publishers' decision to grant licensing rights to ASCAP is an exercise of their Section 106 rights." SPA-66.

In granting licensing rights to ASCAP, "the Publishers acknowledge that they are aware that AFJ2 places restrictions on

ASCAP's ability to license their music in certain ways." SPA-66. And, as the court explained, "AFJ2's restriction on ASCAP means that the Publishers cannot *use* ASCAP to grant and withhold certain rights selectively"—the type of "ancillary effect on a third party's ability to use an entity [that] is present anytime an entity is restricted from doing something." SPA-66.

A publisher is free to withdraw entirely from ASCAP and exercise its Section 106 rights on its own as it sees fit, but a publisher cannot force ASCAP to violate its consent decree.[4] A publisher could not, for example, require ASCAP to violate its obligation to license the publisher's works on the same terms to "similarly situated" applicants. *See* AFJ2 § XIV(C). Tellingly, no publisher chose to withdraw completely

---

[4] Universal argues that "absent the clearest of language, a court should not use a decree entered against one party as a lever for depriving a third-party of its substantial rights." Br. 42. Putting aside the fact that Universal sits on ASCAP's Board and is thus no ordinary "third-party," Universal already voluntarily gave up some rights by joining ASCAP. That choice was presumably based on the calculation that the benefits of membership outweighed the costs imposed by the consent decree's restrictions; it could not have been based on any notion that Universal could enjoy the benefits of using ASCAP without accepting the limits imposed by the decree, as no such option is or was available. In all events, the decree does require, in the clearest of language, ASCAP to license "all of the works in the ASCAP repertory" to any music user.

from ASCAP in the wake of the court's opinion—confirming the choice made by those publishers to take the good with the bad.

## C. ASCAP's and the publishers' remaining arguments are meritless.

ASCAP, Sony, and Universal assemble a variety of additional arguments in an effort to show that the decree means something other than what it says. Because the decree's language is clear, these arguments miss the point. In any event, they are unpersuasive on their own terms.

### 1. The history and purposes of the decree do not support the appellants' position.

ASCAP first turns to the decree's history. "In contrast to AFJ2," ASCAP points out, "the original 1941 ASCAP consent decree expressly permitted ASCAP to prohibit exclusive direct licensing by its members." Br. 36.[5] That provision was removed in 1950, which ASCAP takes to mean that its members may now engage in exclusive direct licensing. *Id.* Contending that prohibiting selective withdrawals is tantamount to

---

[5] An "exclusive" direct license entitles the licensee alone to perform the licensed work or works. With a "non-exclusive" direct license, the licensor may grant licenses to other users as well. "Direct" denotes a license executed between a publisher and a music user, without going through ASCAP.

36

prohibiting exclusive direct licensing, ASCAP accuses the District Court of putting the removed provision back into the decree.

But the decree prohibits ASCAP only from "interfering with the right of any member to issue, directly . . . *non-exclusive* licenses to music users." AFJ2 § IV(B) (SPA-5) (emphasis added). By implication, ASCAP may prohibit its members from issuing *exclusive* licenses to music users for works in ASCAP's repertory. That makes sense, as granting an exclusive direct license effectively removes a work from the ASCAP repertory altogether; the exclusivity means that ASCAP no longer may license the work. If a member decides to keep a given work in the ASCAP repertory, on the other hand, by definition it cannot issue an exclusive direct license for that work. For that reason, the court was correct that "[a]ny prohibition on ASCAP banning exclusive licensing is entirely consistent with AFJ2 permitting the total withdrawal of a song from ASCAP's repertory." SPA-46.

For its part, Universal asserts that "[i]t is peculiar . . . to construe a decree resolving an antitrust suit to *require a greater agglomeration* of rights when the relevant parties have instead chosen to exercise their rights separately." Br. 50. But publishers are free to enter into non-

exclusive direct licenses with music users outside of ASCAP, and music users can obtain deductions from their ASCAP blanket licenses to account for works directly licensed. Publishers are also free to withdraw works, or their entire catalogs, from ASCAP's repertory.

That result promotes competition between publishers and the performing rights organizations. If a music user may obtain the rights to perform a publisher's works either through a blanket license with ASCAP or a direct license with the publisher, ASCAP and the publisher will have an incentive to compete on price. *Cf. Broad. Music, Inc. v. DMX Inc.*, 683 F.3d 32, 48-49 (2d Cir. 2012). Allowing ASCAP members to selectively prohibit ASCAP from licensing works in its repertory to certain music users reduces from two to one the entities that can license that member's works and undermines the purpose of the decree.

### 2. The District Court's interpretation of the decree does not lead to a "drafting error."

Sony embarks on an adventure through the history of the consent decree. While difficult to follow, the point appears to be that "[i]f 'ASCAP repertory' means 'works,' Articles VI and IX would read '*the works in the [works]*,'" which makes little sense. Br. 45–46. Sony purports to avoid this "drafting error" by re-defining "ASCAP repertory" to

mean what the decree says it means: "the right of public performance of which [of those works] that ASCAP has the right to license." *Id.* at 46.

It is not clear what that circular reasoning is supposed to prove. The court did not suggest that "ASCAP repertory" simply means "works." The decree, after all, contains an express definition of "ASCAP repertory," which is "those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time." AFJ2 § II(C) (SPA-2).

Instead, the court correctly explained that Section II(C) establishes that "the ASCAP repertory consists of works the right to which ASCAP has the ability to license at all." SPA-33. There is no drafting error: Sections VI and IX make perfect sense. The former requires ASCAP to grant a license covering a work if ASCAP has the right to license the public performance of that work; that obligation arises upon a request by "any music user;" and the latter gives a petitioning music user the right to perform a work while its petition is pending if ASCAP has the right to license the public performance of that work.

Sony appears to have gotten twisted up, not because of a drafting error in the decree, but rather because of transcription errors in its

brief. Sony repeatedly misquotes Section II(C)'s definition of "ASCAP repertory" as referring in the plural to the "*rights* of public performance" that ASCAP has the right to license. Br. 43, 46 (emphasis added).

In reality, Section II(C) refers to "works the right of public performance of which" ASCAP has the right to license. This subtle transformation of "right" to "rights" is apparently intended to support the argument that Section VI requires ASCAP to license only whichever public performance rights, out of the copyright holder's bundle of divisible rights, the copyright holder has given ASCAP the right to license for a given work. *See* Sony Br. 46 (asserting that Section VI "simply requires ASCAP to license only those public performance rights" it has the right to license). Universal similarly tells the Court that Section II(C) "merely takes as a given whatever 'right[s] to license' ASCAP may happen" to have. Br. 22 (alteration in original); *see also id.* at 33 (identical formulation).

If "ASCAP repertory" were defined in terms of divisible rights rather than in terms of works, the thinking appears to go, it would be more plausible that a publisher could grant ASCAP the right to license

40

the public performance of a given work to certain kinds of music users but not to other kinds. But creative license cannot obscure the fact that "ASCAP repertory" is defined in terms of works, not divisible performance rights; the decree's language plainly contemplates that ASCAP either does or does not have the right to license "the right of public performance" of a given work, not that the answer to that question depends on which music user is asking.[6]

### 3. The "grand" right, jukebox, and noncommercial broadcaster exclusions do not undermine the District Court's conclusion.

Pointing to ASCAP's inability to license "dramatic public performance rights" (the so-called "grand" right), coin-operated phonorecord players (jukeboxes), and non-commercial broadcasters, Sony asserts

---

[6] This "drafting error" argument was also not preserved for appeal. When the court granted the publishers' motion to intervene for the purpose of appeal, it restricted their arguments to those raised by ASCAP or relating to section 106 of Copyright Act. SPA-157. Given the publishers' failure to timely move to intervene despite their awareness of the summary judgment proceedings—which included Pandora's motion seeking the relief that the court ultimately awarded—that limitation was within the court's discretion. "A party who has not raised an issue below is precluded from raising it for the first time on appeal." *Vintero Corp. v. Corporacion Venezolana de Fomento*, 675 F.2d 513, 515 (2d Cir. 1982) (per curiam) (internal quotation marks omitted).

that "[p]artial exclusions from ASCAP's licensing rights under the consent decree are not 'unprecedented.'"  Br. 54.

This argument was not raised below and is not properly before this Court.  In any event, these exclusions are categorical and do not depend on the identity of the music user.  Moreover, unlike the selective withdrawals, these exclusions appear either in the decree or the Copyright Act.  For example, both the decree and the Act expressly prohibit ASCAP from licensing grand rights.  AFJ2 § II(Q) (SPA-4); 17 U.S.C. § 101 (defining a "performing rights society" as an entity "that licenses the public performance of *nondramatic musical works*") (emphasis added).  And the Act explicitly mandates the jukebox and non-commercial broadcaster exclusions.  *See id.* §§ 116(a), 118.  The absence of a provision permitting selective withdrawals either in the decree or the Act is additional confirmation that no such right exists.

### 4.    *The District Court did not violate Rule 56(f).*

Sony complains that the District Court failed to comply with Rule 56(f), which permits a court "[to] grant the motion on grounds not raised by a party" so long as the court gives "notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f).  Sony accuses the court of granting relief

that Pandora did not seek without giving notice to the publishers.  Br. 33.

Not so.  Pandora's motion requested the relief that the court awarded: a declaration that any withdrawals could not affect the scope of the repertory subject to Pandora's license. *Compare* Mem. Summ. J. at 1 (Jul. 1, 2013) (Doc. 38) *with* SPA-49.  Pandora's brief also advanced the reasoning that the Court ultimately adopted, and the Court made clear that it considered the publishers' arguments in rendering its decision.  *See* Mem. Summ. J. at 23 (Jul. 1, 2013) (Doc. 38); Reply Summ. J. 5–6 (Jul. 26, 2013) (Doc. 53); JA-646–47.

In any event, Sony's argument would lack merit even if the court had granted relief different from what Pandora sought.  At the time of the summary judgment proceedings, the publishers had not intervened. The court must notify the "losing party" if it intends to enter summary judgment *sua sponte*, *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014) (citation omitted), but the court need not seek out and deliver the news to any *non-party* that might conceivably be affected.  Sony's complaint is particularly misplaced because Sony ad-

mits that it was aware of the proceedings and nevertheless expressly decided *not* to move to intervene.

Moreover, the court *did* provide advance notice to the publishers by issuing a set of pre-argument questions making "clear that the Court was considering a ruling that would prevent ASCAP from licensing works to certain licensees but not others." SPA-56. And, during the argument, the court "indicated that it found the text of AFJ2 clear in prohibiting" the selective withdrawals. SPA-56.

> **D.** **In the alternative, the District Court's order should be affirmed because Pandora applied for a license before the selective withdrawals.**

The decree separately prohibits ASCAP from diminishing the scope of a user's license after the user has submitted its application. The decree specifies that, "[p]ending the completion of any . . . negotiations or proceedings, the music user shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains." AFJ2 § IX(E) (SPA-11).

Universal contends that the decree contemplates a repertory that fluctuates over time because it defines "ASCAP repertory" in terms of the works that ASCAP "has or hereafter shall have the right to license

at the relevant point in time."  Br. 47 (citing AFJ2 § II(C) (SPA-2) (emphasis omitted)).  But the music user is entitled to perform "all of the works in the ASCAP repertory *to which its application pertains*," which makes clear that the "relevant point in time" in the context of a pending application is the time of the music user's application.  SPA-11.

Universal also asserts that "the temporary permission granted by section IX(E)" is not a "license."  Br. 48.  As the court correctly concluded, however, this terminological dispute "does not provide any evidence of a substantive difference in the rights of 'applicants' and 'licensees.'"  SPA-42.  In recent comments submitted to the Department of Justice, ASCAP itself recognized that section V(A) of the decree, upon adoption in 1950, "required ASCAP to issue licenses on request to all *applicants*, thus strengthening the mandate of the 1941 consent decree that ASCAP may not refuse to offer a license to any *applicant*."[7]

---

[7] Comments of ASCAP Regarding Review of *ASCAP* and *BMI* Consent Decrees 10 (Aug. 6, 2014), *available at* http://www.justice.gov/atr/cases/ascapbmi/comments/307803.pdf (emphasis added).

## II. The District Court set a reasonable rate of 1.85 percent for each year of the five-year license.

The consent decree "disinfect[s]" ASCAP "as a potential combination in restraint of trade." *Showtime*, 912 F.2d at 570 (internal quotation marks omitted). In particular, "the rate court provision of the Decree was designed to ensure against excessive fee demands by ASCAP" by allowing music users to seek a judicial determination as a safeguard. *United States v. ASCAP* (*In re Application of Buffalo Broad., Co.*), No. 13-95 (WCC), 1993 WL 60687, at *28 (S.D.N.Y. Mar. 1, 1993). "The rate court is responsible for establishing the fair market value of the music rights, in other words, the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *Music Choice IV*, 426 F.3d at 95 (internal quotation mark omitted).

In setting the rate, the court should "regard[] ASCAP's market power as a relevant consideration," *Showtime*, 912 F.2d at 570, and "must take seriously the fact that [it] exist[s] as a result of monopolists exercising disproportionate power over the market for music rights." *Music Choice IV*, 426 F.3d at 96. The "appropriate analysis" seeks to arrive at a result that would be consistent with a "competitive market" outcome, as the "principal concern in seeking to determine a reasonable

royalty is the policy of encouraging competition . . . and avoiding inflated pricing resulting from artificial market control." *Showtime*, 912 F.2d at 576, 577.

"A rate court's determination of the fair market value of the music is often facilitated by the use of benchmarks—agreements reached after arms' length negotiation between other similar parties in the industry." *Music Choice IV*, 426 F.3d at 94. In selecting an appropriate benchmark, "a rate court must determine 'the degree of comparability of the negotiating parties to the parties contending in the rate proceeding, the comparability of the rights in question, and the similarity of the economic circumstances affecting the earlier negotiators and the current litigants.'" *Id.* (quoting *ASCAP*, 1993 WL 60687, at *18).

### A. The District Court reasonably concluded that ASCAP failed to carry its burden with respect to its proposed rates for 2013–2015.

ASCAP's principal claim is that the District Court committed clear error by using a benchmark—the Pandora-EMI license—that ASCAP itself proposed. In ASCAP's view, the court should have used the Sony and Universal licenses with Pandora to sharply increase Pandora's rate over the five-year license term. But the parties agreed that

47

1.85 percent was an appropriate rate for 2011–2012, which strongly indicates that a willing buyer and a willing seller (in a competitive market) would have agreed to that rate at the relevant point in time.

Moreover, the court carefully considered the circumstances surrounding the Sony and Universal direct licenses and acted well within its discretion in finding that ASCAP failed to show that those agreements were the products of a "competitive market," rather than representing "inflated pricing resulting from artificial market control." *Showtime*, 912 F.2d at 577. Although ASCAP faults the court for "rejecting those benchmarks altogether, rather than making appropriate adjustments to them" (Br. 50), the court was not obligated to use inapplicable putative benchmarks and then make adjustments to them when other licenses were available that were the product of a competitive market and required little or no adjustment.

In arguing to the contrary, ASCAP ignores that this appeal comes after a bench trial. ASCAP recites the evidence *it* presented, but forgets that the court expressly rejected much of that evidence, often finding that ASCAP's witnesses lacked credibility.

48

### 1. The District Court did not clearly err in finding that the Sony and Universal licenses were the product of coordination.

The court concluded that "the Sony and UMPG licenses were the product of, at the very least, coordination between and among these major music publishers and ASCAP." SPA-174. The evidence of coordination is as extensive as it is compelling. "Sony and UMPG justified their withdrawal of new media rights from ASCAP by promising to create higher benchmarks for a Pandora-ASCAP license and purposefully set out to do just that." SPA-174; JA-2865–67; JA-3123.

When ASCAP and Pandora appeared to be on the verge of an agreement, "UMPG pressured ASCAP to reject the Pandora license ASCAP's executives had negotiated, and Sony threatened to sue ASCAP if it entered into a license with Pandora." SPA-174. The court also found that the testimony of Brodsky and Horowitz, the first-line proponents of using the Sony and Universal agreements as benchmarks, lacked credibility. *See, e.g.*, SPA-142, 144, 154.

ASCAP seeks solace in the fact that the court "did not find that this alleged 'coordination' rose to the level actually prohibited by the antitrust laws, or any laws." Br. 46. True, but irrelevant. "What is

important," as the court explained, "is that ASCAP, Sony, and UMPG did not act as if they were competitors with each other in their negotiations with Pandora." SPA-175. ASCAP's Chairman, for example, testified that ███████████████████ to engage in price competition with the withdrawing publishers. PX-021. "Because [ASCAP's, Sony's, and Universal's] interests were aligned against Pandora, and they coordinated their activities with respect to Pandora, the very considerable market power that each of them holds individually was magnified." SPA-175. *Cf. Showtime*, 912 F.2d at 570.

ASCAP also dismisses the court's finding that Sony, Universal, and ASCAP used the selective withdrawals as a way to generate higher rate court benchmarks; ASCAP claims "there is no evidence of any 'promise' of higher rates by the publishers, much less anything resembling an actual *quid pro quo*." Br. 47. But that is not what the court found. It found that one of the purposes of the withdrawals was to obtain direct licenses that "could be used in rate court litigation to raise the ASCAP license fees." SPA-122. That finding was supported by an e-mail from ASCAP's Chairman stating that the selective withdrawals "will set a higher market price which will give us bargaining power in

50

rate court." SPA-122. Similarly, ASCAP's DeFilippis was "optimis[tic]" that direct agreements between Pandora and the publishers could be used to establish a higher benchmark. JA-3123.

ASCAP also objects to the court's finding that ASCAP rejected a deal with Pandora because of pressure from Sony and Universal. Br. 48. But the record amply supports this finding as well. Universal's Horowitz (before notifying ASCAP of his intent to withdraw) exhorted ASCAP's LoFrumento to "be strong" in negotiating with Pandora. JA-3950. Horowitz's e-mail stated: "[Pandora's counsel] and Pandora are scared. They just want to settle with ASCAP and settle fast. Be strong. Time is on your side." JA-3950. Horowitz forwarded that e-mail to the heads of the other major publishers on ASCAP's Board of Directors. JA-3950–62. LoFrumento agreed with Horowitz and confided that "we are approaching Pandora with that mindset." JA-4157.

The court also made thorough and well-supported findings about why LoFrumento ultimately rejected the deal with Pandora. Bandier threatened LoFrumento that if ASCAP licensed Pandora, Sony would "take appropriate action against ASCAP," including bringing a lawsuit. JA-3409–10; SPA-135. Moreover, Sony had "notified ASCAP that it

51

might not use ASCAP for administration services if ASCAP issued a license to Pandora," which would have left ASCAP with no direct compensation associated with publisher withdrawals. SPA-135–36; JA-3410, JA-3419–20.

Finally, ASCAP challenges the court's finding that "Sony made sure that UMPG learned of all of the critical terms of the Sony-Pandora license." Br. 49–50 (internal quotation marks omitted). But key terms of the license were leaked to the press, and news articles "referred to anonymous industry insiders as their source[s] and quoted [Sony's] Bandier's analysis of the deal." SPA-147 n.48. Furthermore, "Pandora had absolutely no interest in seeing the 25% hike in its rates known to other licensors," but "Sony hoped that its rate would be a jumping off point for the next publisher's negotiations with Pandora, and it was." SPA-147 n.48; *see also* JA-2865–67; JA-3123. ASCAP's protest (Br. 50) that Sony's witnesses denied leaking this information exemplifies ASCAP's failure to grapple with the fact that there was a trial and it lost: ASCAP's description of Sony's evidence omits that the court acknowledged Sony's denials and specifically found them not credible. SPA-147 n.48.

2. ***The District Court did not clearly err in finding that Sony's and Universal's refusal to provide lists of their works that Pandora could use to take down those works put Pandora at a severe disadvantage in the negotiations.***

The court also made extensive findings regarding Sony's deliberate refusal to provide Pandora a list of its works and Universal's refusal to provide a list of its works that Pandora could use in an effort to take down Universal-controlled compositions. *See* SPA-176-80. Far from clearly erroneous, these findings are plainly correct.

The court found, for example, that Pandora needed a list "to remove the Sony works from its service if Pandora and Sony could not come to terms," as well as to "understand how to apportion any payments between the EMI and Sony catalogues" and to "evaluate whether the substantial, non-refundable advance that Sony was demanding would likely be recouped." SPA-142.

The court also found that although "Sony had a list readily at hand," Sony "understood that it would lose an advantage in its negotiations with Pandora if it provided the list of works and deliberately chose not to do so." SPA-142. Recognizing the value of the list to Pandora, Sony, which "knew that it held the upper hand," repeatedly refused to

provide it. SPA-177; JA-2808–09; JA-2372; JA-3598; JA-4492–95. Sony's refusal to provide the list "deprived Pandora of significant leverage in their negotiations. Pandora was faced with three options: shut down its business, face crippling copyright infringement liability, or agree to Sony's terms." SPA-177–78; JA-2809. The court specifically rejected Brodsky's contrary testimony as "not credible." SPA-142.

Universal, for its part, provided Pandora with a list of its works, but on terms that prevented Pandora from using it to remove them. Universal would provide a list only if Pandora agreed not to use it for any "purpose except to evaluate and engage in discussions concerning a potential business relationship between the Parties." SPA-154; JA-4316. As the court found, "[this agreement] would appear to any reasonable reader to prohibit Pandora from using the list to take down UMPG works from its service." SPA-183.

ASCAP suggests that Pandora did not really need the lists because it had "never evidenced any need for a list of works from its actual or prospective licensors" in the past. Br. 43. But of course a person does not need a bulletproof vest until he is being shot at. The availability of a blanket license from ASCAP meant that Pandora had never

54

before needed lists of works from individual publishers. SPA-176. But after Sony sought to prevent Pandora from licensing its works through ASCAP, "the identity of the Sony works suddenly became significant to Pandora." SPA-176.

ASCAP also purports to find an inconsistency with the court's reliance on the EMI agreement as a benchmark, pointing out that Pandora never requested or received a list of EMI's works. Br. 44. But the court explained that "Pandora did not need a list of EMI works since it learned in its first substantive meeting with EMI that EMI was not seeking an increase in Pandora's license rate." SPA-180; JA-2806–07.

ASCAP next insists that Pandora's need for a list of works was "pretextual" because "Pandora never took even the first step to prepare to remove those publishers' songs." Br. 44. But "Pandora needed the publishers' list of works before it could take any steps to remove them from the Pandora service." SPA-145. Once Pandora had a list, "it could quite quickly remove any song with an identical title and eliminate the copyright infringement risk." SPA-145. Pandora could not take any steps to remove the works without a list of works provided by the pub-

lisher, as information about publisher ownership from other sources "is not consistently available" and "historically inaccurate." JA-2810.

Relying on Dr. Murphy's testimony, ASCAP also contends that the court "erred in concluding that music publishers would provide a list of works to Pandora in a free-market transaction unaffected by a consent decree." Br. 45. But Dr. Murphy's economic model was "too divorced from the world in which Pandora and Sony were actually functioning to be helpful" because it assumed an "atomistic marketplace." SPA-178. "In a competitive, atomistic market, if one of many rights holders refuses to share critical information, then the music user can see if a competitor will be more cooperative." SPA-178. But that theoretical point was irrelevant, because "Pandora and Sony operated in a highly concentrated market." SPA-178.

Moreover, "Pandora had built its business with the understanding that it could obtain a blanket license from ASCAP." SPA-179. That meant Pandora already had "incorporated the Sony repertoire into its [Music Genome Project]. Unlike a new entrant into a market, it was not free (at least, without a list of the Sony works) to attempt to create a business model that made no or more limited use of Sony music."

56

SPA-179.  Because the performing rights organizations historically granted blanket licenses, a music user previously did not need to know which publishers owned which compositions.  That reality contributed to the court's finding that Pandora's choices, without a list from Sony, were to "shut down its service, infringe Sony's rights, or execute an agreement with Sony on Sony's terms."  SPA-174.  With more than a million tracks on its service and no way to identify which belonged to Sony, Pandora had no way to avoid ruinous infringement liability without shutting down its business or accepting Sony's terms—just as Sony intended.

███████████████████████  As such, "[e]ven if Sony had provided the list of its works to Pandora, Sony would have retained enormous bargaining power."  SPA-179.  Sony, however, chose to go further and refuse to provide a list to ensure that Pandora would have no choice but to accept Sony's terms.  As the court correctly found, "by withholding the list, Sony deprived ASCAP of a chance to argue in any persuasive way that the Sony-Pandora license reflects a fair market price."  SPA-179; *see also* JA-2808–09; JA-2372; JA-3598; JA-4492–95.

Finally, ASCAP challenges the court's finding that the confidentiality terms demanded by Universal prohibited Pandora from using Universal's list to take down Universal compositions. Br. 45. But the non-disclosure agreement defined the "titles of songs in Universal's music catalog controlled by ASCAP [and] corresponding writer names" as the very "Confidential Information" that could not be used "for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the [p]arties"—a restriction that plainly prohibited Pandora from using the list to remove Universal compositions. JA-4316.

Although Pandora did not advise Universal during negotiations that it interpreted the non-disclosure agreement to prevent it from using the list of works in this way, that is because further discussions about the non-disclosure agreement would have been fruitless: "UMPG's insistence on an NDA addressed exclusively to the list of works was reasonably taken by Pandora as further evidence that any efforts to negotiate with UMPG would be futile." SPA-184; JA-4709. JA-4709.

For all these reasons, it is no wonder that ASCAP felt compelled to

acknowledge in closing arguments that "we've understood throughout the entire trial that the list issue was not a source of strength for us on this record." JA-1710.[8]

## B. The District Court did not err in declining to rely on ASCAP's secondary benchmarks.

ASCAP also faults the District Court for declining to rely on the SESAC-Pandora license and the iTunes Radio licenses. As the court found, however, those licenses were inapposite.

### 1. The District Court correctly determined that the SESAC-Pandora license is not comparable.

The court gave several cogent reasons for declining to rely on the SESAC-Pandora license. First, it noted that, "even at its upper range, the SESAC license rate is lower than the implied Sony rate of 2.28% and implied UMPG rate of 3.42% for ASCAP licenses to Pandora." SPA-185; JA-2859.

---

[8] ASCAP suggests that the court's holding on the meaning of the decree "tainted the entire rate proceeding, leading it to reject the marketplace agreements." Br. 3. But the court based its rate determination on the evidence of coordination, the publishers' refusal to provide useful lists of their works, and a host of other findings. Those factors would make the Sony and Universal licenses inappropriate benchmarks even if the selective withdrawals were permissible.

Second, the court observed that "[t]he SESAC license has histori-cally been a benchmark of limited value because the public knows little about the size of the SESAC repertoire." SPA-185 (citing *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 254 (S.D.N.Y. 2010)). SESAC is much smaller than ASCAP or BMI, which "amplifies any error in a projection, but also reduces the incentive to resist SESAC's rate re-quests." SPA-185; JA-2858; JA-2951.

Third, "Pandora's contemporaneous understanding of the SESAC repertoire and the rate undercut any suggestion that it supports an ASCAP rate above 1.85%." SPA-186. In particular, "SESAC argued that an escalating rate in the SESAC license was appropriate to account for SESAC's anticipated growth in market share." SPA-186; JA-2803. And no evidence was presented that ASCAP's market share was grow-ing. It stood to reason, then, that an increase in SESAC's market share would correspond to a decline in ASCAP's. SPA-186; JA-2859–60. "Thus, if this principle were applied even-handedly, for the latter years of the ASCAP-Pandora license, the ASCAP rate might move below 1.85%." SPA-186.

ASCAP insists that Pandora "presented no reliable evidence to support its argument, which the District Court credited, that SESAC claimed to have a 10% market share at the time the parties entered into the license." Br. 51. But Pandora's CEO specifically testified that he understood SESAC to have approximately a 10 percent share. JA-2803; *see also* JA-4663.[9]

### 2. The District Court reasonably declined to rely on licenses with Apple.

The Apple licenses are not appropriate benchmarks. "Apple conducted negotiations for its licenses for the public performance of compositions within the context of a business model that has no analogue for Pandora." SPA-187. That is because "Apple sells digital downloads and operates a locker system so that subscribers may access their music from any of their Apple devices." SPA-187. "The integration of these services, seamlessly, within the Apple ecosystem generates synergies." SPA-187.

---

[9] ASCAP's claim that "even accepting SESAC's market share to be 10%, that share would still lead to a" rate above the one the court set, Br. 51, ignores the several alternative grounds the court gave for declining to rely on the SESAC license.

61

ASCAP objects that "[t]here was no evidence to support the court's finding that the rates agreed to in the iTunes Radio licenses can be attributed to 'synergies' within 'the Apple ecosystem' that have 'no analogue to Pandora,'" but admits in the same sentence that Pandora's expert offered testimony to that effect. Br. 53 (quoting SPA-187); JA-2850–51. That testimony is sufficient to support the court's finding. *See Showtime*, 912 F.2d at 569.

In addition, ASCAP's own expert and witnesses from Universal and Sony admitted that Apple intended to use iTunes Radio to stimu-late sales of Apple hardware and iTunes downloads. JA-1365; JA-1253; JA-1511. The licensing agreements themselves stated ███████████ █████████████████████████████████████████████████ JA-2418; JA-2433; JA-2449.

The court also pointed out that the Apple revenue base does not include imputed revenue from Apple's own advertisements of its music offerings. SPA-187–88; JA-1325; JA-2451; JA-2518. Nor does it include any portion of iTunes Match subscription fees (from subscribers who receive iTunes Radio on an ad-free basis), revenue from the sales of downloads, or purchases made by customers who click the buy button

while listening to iTunes Radio. SPA-188; JA-1252; JA-1325; JA-1365. It thus makes sense that Apple would have agreed to a higher percentage of revenue *rate* on a smaller revenue *base*. At the least, the court's finding to that effect is not clearly erroneous.

ASCAP objects that "[t]here also was no basis for the District Court to reject the iTunes Radio licenses based on the assumption that iTunes Radio additional revenue from iTunes Match subscription fees is not captured in the revenue base of the iTunes Radio licenses." Br. 53. But Apple provided iTunes Match subscribers with the iTunes Radio service on an ad-free basis, thus providing benefits to those subscribers with no contribution to the iTunes Radio revenue base. JA-1252; JA-1325; JA-2439; JA-2455; JA-2518. ASCAP's own expert agreed that Apple licenses would need to be adjusted to account for iTunes Match subscription fees and that he lacked adequate information to make such adjustments because "the service had just started." JA-1367.

ASCAP believes that the "record demonstrated that Apple is, in fact, running iTunes Radio as an advertising supported business—and that those advertising revenues are included in the revenue base of the iTunes Radio licenses." Br. 53. But that is beside the point. Although

some advertising revenues were included in the revenue base, the evidence showed that a host of additional revenues are not included (including free advertising for Apple products that generate those other revenue streams).  JA-1325; JA-2451; JA-2518.

### C.  This Court's *RealNetworks* decision does not require a rate of 2.5 percent or higher for Pandora.

ASCAP also accuses the District Court of "[i]gnoring" this Court's decision in *RealNetworks*, where this Court stated in *dicta* "that the royalty rate agreed to by Music Choice . . . provides a basis for a 2.5% royalty rate, or higher, for Yahoo! sites and services that permit an interactive music experience, in which the user may control the selection of music he is hearing, for example if a user tunes into a more customized station or uses Yahoo! Search to listen to songs on-demand."  *RealNetworks*, 627 F.3d at 81.

ASCAP vastly overreads this dicta, suggesting that this Court "affirm[ed] Judge Conner's selection of the 2.5% rate as a benchmark" for services like Pandora.  Br. 21-22.  In ASCAP's view, the Court should disregard the factual record in *this* case and impose a 2.5 percent rate based on the record in *RealNetworks*, which closed seven years ago.  But ASCAP does not have the courage of its convictions.  ASCAP proposed a

1.85 percent rate for 2011–2012, substantially less than the 2.5 percent rate that ASCAP now suggests *RealNetworks* requires.

Moreover, ASCAP's proposal cannot be reconciled with this Court's instructions to the rate court to conduct a fact-intensive inquiry into the circumstances of the marketplace. *Music Choice IV*, 426 F.3d at 96. The court's task is not to determine the platonically correct rate for all music users; it is to identify a reasonable rate or range of rates supported by the evidence in the case at hand. The record in *RealNetworks* may have supported a rate of 2.5 percent or higher in *that* case (for some kinds of services), but the court carefully explained why the record supports a 1.85 percent rate here.

Far from ignoring *RealNetworks* and the Music Choice license as ASCAP charges (Br. 55), the court requested supplemental briefing on them. And the court then explained that it would not rely on the Music Choice license because "neither side had the ability to conduct discovery and develop evidence" that would allow the court "to put the 2.5 percent rate in [an] appropriate context." JA-1677.

The court was correct. ASCAP's own expert reports did not propose Music Choice as a benchmark. One of ASCAP's fact witnesses,

DeFilippis, briefly discussed Music Choice, but that testimony was inadmissible for the truth of the matter asserted. *See* JA-1753; JA-1755; Pandora Letter to Judge Cote (Jan. 16, 2014) (Doc. 157). The parties' cases did not focus on Music Choice, and the court did not clearly err in finding the factual record insufficient to determine whether or how the result there might apply here. Although ASCAP mentioned *RealNetworks* and Music Choice in its pre-trial submissions, those submissions were made at the time the parties submitted their written direct cases, leaving Pandora with no opportunity to conduct discovery.

In all events, the limited evidence presented during cross-examination showed that Music Choice would be an inappropriate benchmark. As Pandora's expert Dr. Marx explained, the Music Choice rate was based on wholesale revenues, while Pandora's rate would be based on retail revenues, JA-1441, and "[r]oyalty rates applied to a retail revenue base would naturally be lower than those applied to an intermediate revenue base in order for both to yield the same total royalty." JA-2849–50. Indeed, discussion of a rate is meaningless when untethered from a revenue base.

Dr. Noll similarly testified that applying the Music Choice license would require adjustments to the Music Choice rate and royalty base that would be extremely difficult. JA-1560. That testimony provides ample support for the court's conclusion that "Music Choice . . . is in a substantially different business, which would have a very different expense structure and a very different profit expectation if one looked at its competitors." JA-1589–90. *See also MobiTV*, 712 F. Supp. 2d at 242 (explaining that "a 2.5% rate is an artificially high rate to apply to retail revenue").

Other factors also support the court's decision not to rely on Music Choice. The Music Choice/ASCAP license expired in 2010. Supp. Memo. Regarding Music Choice at 16 (Feb. 7, 2014) (Doc. 203). No other final license in the record here applies a 2.5 percent rate to non-interactive/radio programming beyond 2010. *Id.* And after the *Real-Networks* record closed, this Court clarified that services like Pandora are *non*-interactive services rather than interactive ones. *See Arista Records v. Launch Media*, 578 F.3d 148, 164 (2d Cir. 2009). Rather than rely on an expired license with no other corroborating licenses in

the record, the court reasonably decided to rely on the more recent and on-point Pandora-EMI license.

### D. The District Court did not err in declining to adopt an escalating rate.

ASCAP challenges the District Court's refusal to adopt an escalating rate structure. As the court explained, however, "adoption of an escalating rate . . . would be out of step with historical practice" and inconsistent with the principle that "the value of music to a user is assumed to remain constant through the term of a license." SPA-172. In addition, "a single rate facilitates business planning, encourages reliance on historical data, and discourages resort to contested projections." SPA-173.

ASCAP asserts that the 2001–2009 ASCAP-RMLC agreement "included an escalating rate for each year." Br. 59. In truth, that license included escalating lump-sum payments; it did not base royalties on a percentage of revenue at all. That payments increased from year to year is unremarkable: although the rate the court set here remains constant, Pandora's payments have and will continue to increase year-by-year as revenues increase. JA-2787–88. Moreover, the court's rate structure is consistent with ASCAP's most recent license with the

68

RMLC, which includes a fixed rate of 1.70 percent of revenue for the entire seven-year term.[10]

ASCAP also points out that the SESAC license included an escalating rate. Br. 59. "In that case, however, SESAC's escalating rate was justified by a mutual assumption that SESAC's market share would increase over the term of the license." SPA-172. ASCAP disagrees, but the evidence showed that growth in SESAC's repertory could increase its market share. *See* JA-4680. Moreover, SESAC recently settled an antitrust case containing allegations that SESAC insisted on "license agreements with substantial and unjustified automatic annual increases." *Meredith Corp. v. SESAC, LLC*, No. 1:09-cv-9177 (S.D.N.Y. filed Nov. 4, 2009), Doc. 1 ¶ 37.

---

[10] ASCAP's argument based on the 2001–2009 ASCAP-RMLC license also ignores that that license disclaims any escalating rate, stating that "the parties have expressly not agreed that the Annual License Payment set forth herein comprises reasonable license fees for a particular year but instead reflect arbitrary yearly allocations for the convenience of both the Licensees and ASCAP." JA-2364. And ASCAP omits that it agreed with the RMLC that that license would be non-precedential "in connection with the determination of final fees for any subsequent period for local commercial radio stations, or any other user of ASCAP music. . ." JA-2364.

In any event, SESAC licenses are of limited probative value for the reasons explained above, *see supra* at 59–61, and the court made clear that its determination did not depend on a presumption of a single rate, observing that, "even without such a presumption [ASCAP] has not carried its burden to establish that the rates of 2.50% and 3.00% are reasonable." SPA-173.[11]

**E.    The District Court did not abuse its discretion in declining to consider agreements entered into during trial.**

ASCAP objects to the court's decision not to reopen discovery to consider new direct licenses. But ASCAP's demand to reopen discovery came after the parties had submitted direct witness statements—in other words, in the middle of trial. "A District Court has broad latitude to determine the scope of discovery and to manage the discovery process," and the court did not abuse that discretion here in declining to put the trial on hold. *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012).

---

[11]   ASCAP claims (Br. 3) that "every relevant agreement negotiated in 2012 or later provided for rates in excess of 1.85%." That ignores the Pandora-EMI agreement signed in March 2012, JA-4142–43, Pandora's continued operation under its BMI license at 1.75 percent, JX-059, and the ASCAP-RMLC agreement entered into in 2012, JX-109.

If the court had concluded otherwise, the delay would have been indefinite. The parties had conducted extensive third-party discovery, and reopening discovery to consider additional licenses would have delayed the trial for months if not years. Requiring all potentially relevant licenses executed during the term of the requested ASCAP license to be considered as potential benchmarks could delay trial until after the end of the requested license term, in this case 2016. That would dramatically increase litigation costs and threaten to chill licensing activity during any court proceedings. It would also contravene the directive that the parties should "have the matter ready for trial by the Court within one year of the filing of the application." AFJ2 § IX(E) (SPA-11).

71

## CONCLUSION

The District Court's orders should be affirmed.

Respectfully submitted.

/s/ Kenneth L. Steinthal

| | |
|---|---|
| Jeffrey S. Bucholtz | Kenneth L. Steinthal |
| Ethan P. Davis | Joseph R. Wetzel |
| KING & SPALDING LLP | KING & SPALDING LLP |
| 1700 Pennsylvania Ave., NW | 101 2nd Street, Suite 2300 |
| Washington, DC 20006 | San Francisco, CA 94105 |
| Telephone: (202) 737-0500 | Telephone: (415) 318-1200 |
| Facsimile: (202) 626-3737 | Facsimile: (415) 318-1300 |

*Counsel for Petitioners-Appellees*

October 27, 2014

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a) and

Cir. Rule 32.1(a), I certify that this brief complies with the type-volume

limitations set forth in Fed. R. App. P. 32(a)(7) because it contains

13,990 words, as counted by Microsoft Word, excluding the items that

may be excluded under Fed. R. App. P. 32(a)(7)(B)(iii).

 /s/ Kenneth L. Steinthal

## CERTIFICATE OF SERVICE

I certify that on October 28, 2014, I filed the foregoing brief via the Court's electronic case filing (ECF) system. Pursuant to Cir. Rule 25.1(h), the resulting Notice of Docket Activity generated by the ECF system constitutes service on counsel for the parties.

    /s/ Kenneth L. Steinthal

# ADDENDUM

**SPA-1**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
(WHITE PLAINS)**



| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civ. Action No. 41-1395 (WCC) |
| v. | |
| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, | SECOND AMENDED FINAL JUDGMENT |
| Defendants. | |

 Plaintiff having filed its complaint herein on February 26, 1941, the original defendants having appeared and filed their answer to the complaint denying the substantive allegations thereof, all parties having consented, without trial or adjudication of any issue of fact or law therein, to the entry of a Civil Decree and Judgment, filed March 4, 1941, to the entry of an Amended Final Judgment on March 14, 1950, as subsequently amended and modified and to the entry of an Order thereunder issued on January 7, 1960, as subsequently amended and modified;

 The parties having moved the Court to amend the Amended Final Judgment,

 NOW, THEREFORE, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, without admission by the defendant American Society of Composers, Authors and Publishers with respect to any such issue, and upon consent of all remaining parties hereto, it is hereby

 ORDERED, ADJUDGED, AND DECREED that the Amended Final Judgment be amended as follows:

# SPA-2

I. **Jurisdiction.** This Court has jurisdiction of the subject matter hereof and of all parties hereto. The complaint states a claim upon which relief may be granted against ASCAP under Section 1 of the Sherman Act, 15 U.S.C. §1.

II. **Definitions.** As used in this Second Amended Final Judgment:

    (A) "ASCAP" means the American Society of Composers, Authors and Publishers;

    (B) "ASCAP music" means any work in the ASCAP repertory;

    (C) "ASCAP repertory" means those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time;

    (D) "Background/foreground music service" means a person that transmits performances of music to subscribers and that furnishes to those subscribers equipment not otherwise available to the general public that enables subscribers to make the transmitted performances on their premises. A background/foreground music service does not include radio or television stations or networks, cable television networks or systems, persons that transmit renditions of music to private homes, apartments, or hotel or motel guest rooms, or persons that transmit renditions of music to subscribers that charge admission;

    (E) "Blanket License" means a non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music;

    (F) "Broadcaster" means any person who transmits audio or audio-visual content substantially similar to content that is transmitted by over-the-air or cable radio or television stations or networks as they existed on the date of entry of this Second Amended Final Judgment or that transmits the signal of another broadcaster: (1) over the air, (2) via cable television or direct broadcast satellite, or (3) via other existing or yet-to-be-developed transmission technologies, to audiences using radios, television sets, computers, or other receiving or playing devices;

2

## SPA-3

(G) "Music user" means any person that (1) owns or operates an establishment or enterprise where copyrighted musical compositions are performed publicly, or (2) is otherwise directly engaged in giving public performances of copyrighted musical compositions;

(H) "On-line music user" means a person that publicly performs works in the ASCAP repertory via the Internet or similar transmission facility including any succeeding transmission technologies developed after entry of this Second Amended Final Judgment;

(I) "Performing rights organization" means an association or corporation, such as ASCAP, Broadcast Music, Inc., or SESAC, Inc., that collectively licenses rights of public performance on behalf of numerous copyright owners;

(J) "Per-program license" means a non-exclusive license that authorizes a broadcaster to perform ASCAP music in all of the broadcaster's programs, the fee for which varies depending upon which programs contain ASCAP music not otherwise licensed for public performance;

(K) "Per-segment license" means a non-exclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance;

(L) "Person" means an individual, partnership, firm, association, corporation or other business or legal entity;

(M) "Program" means either a discrete program exhibited by a broadcaster or on-line music user or, if such broadcaster or on-line music user does not exhibit discrete programs, such other portion of the transmissions made by the broadcaster or on-line music user as shall be agreed to by ASCAP and the broadcaster or on-line music user or as shall be determined by the Court in a proceeding conducted under Section IX of this Second Amended Final Judgment;

(N) "Public list" means such records that indicate the title, date of

3

# SPA-4

U.S. copyright registration, if any, writer and current publisher or other copyright owner of all works in the ASCAP repertory, including, but not limited to, the public electronic list;

(O) "Public electronic list" means separate databases of: (1) works in the ASCAP repertory that have been registered with ASCAP since January 1, 1991, or identified in ASCAP's surveys of performed works since January 1, 1978, identifying the title, writer, and current publisher or other copyright owner of each work; and (2) current ASCAP members;

(P) "Representative music user" means a music user whose frequency, intensity and type of music usage is typical of a group of similarly situated music users;

(Q) "Right of public performance" means, and "perform" refers to, the right to perform a work publicly in a nondramatic manner, sometimes referred to as the "small performing right," and any equivalent rights under foreign copyright law, including, but not limited to, rights known as the rights of transmission, retransmission, communication, diffusion and rediffusion;

(R) "Similarly situated" means music users or licensees in the same industry that perform ASCAP music and that operate similar businesses and use music in similar ways and with similar frequency; factors relevant to determining whether music users or licensees are similarly situated include, but are not limited to, the nature and frequency of musical performances, ASCAP's cost of administering licenses, whether the music users or licensees compete with one another, and the amount and source of the music users' revenue;

(S) "Through-to-the-Audience License" means a license that authorizes the simultaneous or so-called "delayed" performances of ASCAP music that are contained in content transmitted or delivered by a music user to another music user with whom the licensee has an economic relationship relating to that content;

(T) "Total license fee" means the sum of all fees paid by the music user in connection with the license, including any fee for ambient or incidental uses but excluding the administrative charges

4

## SPA-5

authorized by Section VII(B) of this Second Amended Final
Judgment;

(U) "Work" means any copyrighted musical composition; and

(V) "Writer" means a person who has written the music or lyrics of a
work.

III. **Applicability.** The provisions of this Second Amended Final
Judgment shall apply to ASCAP, its successors and assigns, and to
each of its officers, directors, agents, employees, and to all other per-
sons in active concert or participation with any of them who shall have
received actual notice of this Second Amended Final Judgment by per-
sonal service or otherwise. Except as provided in Sections IV(A) and
(B) of this Second Amended Final Judgment, none of the injunctions or
requirements herein imposed upon ASCAP shall apply to the acquisition
or licensing of the right to perform musical compositions publicly solely
outside the United States of America, its territories or possessions.

IV. **Prohibited Conduct.** ASCAP is hereby enjoined and restrained from:

(A) Holding, acquiring, licensing, enforcing, or negotiating concerning
any foreign or domestic rights in copyrighted musical compositions
other than rights of public performance on a non-exclusive basis;
provided, however, that ASCAP may collect and distribute
royalties for home recording devices and media to the extent
such royalty collection is required or authorized by statute;

(B) Limiting, restricting, or interfering with the right of any member to
issue, directly or through an agent other than a performing rights
organization, non-exclusive licenses to music users for rights of
public performance;

(C) Entering into, recognizing, enforcing or claiming any rights under
any license for rights of public performance which discriminates in
license fees or other terms and conditions between licensees
similarly situated;

(D) Granting any license to any music user for rights of public
performance in excess of five years' duration;

(E) Granting to, enforcing against, collecting any monies from, or

5

## SPA-6

negotiating with any motion picture theater exhibitor concerning the right of public performance for music synchronized with motion pictures;

(F) Asserting or exercising any right or power to restrict from public performance by any licensee of ASCAP any work in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such work; nothing in this Section IV(F) shall be construed to prevent ASCAP, when so directed by the member in interest in respect of a work, from restricting performances of a work in order reasonably to protect the work against indiscriminate performances, or the value of the public performance rights therein, or the dramatic or "grand" performing rights therein, or to prevent ASCAP from restricting performances of a work so far as may be reasonably necessary in connection with any claim or litigation involving the performing rights in any such work;

(G) Instituting, threatening to institute, maintaining, continuing, sponsoring, funding or providing any legal sevices for any suit or proceeding against any motion picture theater exhibitor for copyright infringement relating to the nondramatic public performance of any work contained in a motion picture, provided, however, that nothing in this Section IV(G) shall preclude ASCAP from pursuing its own *bona fide* independent interest in any such suit or proceeding; and

(H) Issuing to any broadcaster any license the fee for which is based upon a percentage of the income received by the licensee from programs that include no ASCAP music unless the broadcaster to whom such license shall be issued shall desire a license on such a basis; provided, however, that this Section IV(H) shall not limit the discretion of the Court in a proceeding conducted under Section IX of this Second Amended Final Judgment to determine a license fee on any appropriate basis.

V. **Through-to-the-Audience Licenses.** ASCAP is hereby ordered and

6

**SPA-7**

directed to issue, upon request, a through-to-the-audience license to a broadcaster, an on-line user, a background/foreground music service, and an operator of any yet-to-be-developed technology that transmits content to other music users with whom it has an economic relationship relating to that content; provided, however, that, in accordance with Section III of this Second Amended Final Judgment, ASCAP shall not be required to issue a through-to-the-audience license to perform ASCAP music outside the United States. The fee for a through-to-the-audience license shall take into account the value of all performances made pursuant to the license.

VI. **Licensing.** ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory; provided, however, that ASCAP shall not be required to issue a license to any music user that is in material breach or default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP. ASCAP shall not grant to any music user a license to perform one or more specified works in the ASCAP repertory, unless both the music user and member or members in interest shall have requested ASCAP in writing to do so, or unless ASCAP, at the written request of the prospective music user shall have sent a written notice of the prospective music user's request for a license to each such member at the member's last known address, and such member shall have failed to reply within thirty (30) days thereafter.

VII. **Per-Program and Per-Segment Licenses.**

    (A) ASCAP is ordered and directed to offer, upon written request:

        (1) To a broadcaster, a per-program license that shall, in addition, cover ambient and incidental uses and shall not require any record-keeping or monitoring of ambient and incidental uses; and

        (2) To a background/foreground music service or to an on-line music user, a per-segment license if (a) the music user's performances of music can be tracked and monitored to

7

## SPA-8

determine with reasonable accuracy which segments of the
music user's activity are subject to an ASCAP license fee;
(b) the music user's performances of music can be attributed
to segments commonly recognized within the music user's
industry for which a license fee can be assessed; and (c)
administration of the license will not impose an unreason-
able burden on ASCAP; the per-segment license shall, in
addition, cover ambient and incidental uses without any
record-keeping or monitoring of those uses if that is
reasonably necessary to afford a genuine choice among the
various types of licenses offered, or of the benefits of any of
those types of licenses; if a portion of any on-line music
user's transmissions consists of programs substantially
similar to those transmitted by over-the-air or cable radio or
television stations or networks as they existed on the date of
entry of this Second Amended Final Judgment, or is a
retransmission of any broadcaster's programs, it shall be
presumed that each individual program shall constitute a
segment and for those segments the on-line music user need
not meet the requirements of subsections (a), (b) and (c) of
this section.

(B) ASCAP may charge any music user that selects a per-program
license or a per-segment license a fee to recover its reasonable
cost of administering the license.

(C) Nothing in this Second Amended Final Judgment shall prevent
ASCAP and any music user from agreeing on any other form of
license.

(D) The fee for a per-program license and for any per-segment
license issued to an on-line user shall be at the option of ASCAP
either:

(1) Expressed in terms of dollars, requiring the payment of a
specified amount for each program or segment that contains
works in the ASCAP repertory not otherwise licensed for public
performance, or

(2) Expressed as a percentage of the music users' revenue

8

**SPA-9**

attributable to each program or segment that contains works in the ASCAP repertory not otherwise licensed for public performance.

VIII. **Genuine Choice.**

(A) ASCAP shall use its best efforts to avoid any discrimination among the various types of licenses offered to any group of similarly situated music users that would deprive those music users of a genuine choice among the various types of licenses offered, or of the benefits of any of those types of licenses.

(B) For a representative music user, the total license fee for a per-program or per-segment license shall, at the time the license fee is established, approximate the fee for a blanket license; for the purpose of making that approximation, it shall be assumed for the purposes of this Section VIII(B) that all of the music user's programs or segments that contain performances of ASCAP music are subject to an ASCAP fee.

(C) ASCAP shall maintain an up-to-date system for tracking music use by per-program and per-segment licensees; ASCAP shall not be required to incur any unreasonable costs in maintaining such system; ASCAP may require its members and such licensees to provide ASCAP with all information reasonably necessary to administer the per-program or per-segment license including, but not limited to:

(1) cue sheets or music logs;

(2) the date of performance of a work and identification of the program or other segment of the music user's activities that contained the performance;

(3) the title of the work performed; and

(4) the writer, publisher or performing artist;

such requirements shall be designed to avoid unreasonable burdens on ASCAP, ASCAP members and licensees.

(D) The terms and requirements of any license shall be designed to avoid imposing any unreasonable burdens or costs on licensees or ASCAP.

**SPA-10**

IX. **Determination of Reasonable Fees.**

   (A) ASCAP shall, upon receipt of a written request for a license for the right of public performance of any, some or all of the works in the ASCAP repertory, advise the music user in writing of the fee that it deems reasonable for the license requested or the information that it reasonably requires in order to quote a reasonable fee. In the event ASCAP requires such additional information, it shall so advise the music user in writing, and shall advise the music user in writing of the fee that it deems reasonable within sixty (60) days of receiving such information. If the parties are unable to reach agreement within sixty (60) days from the date when the request for a license is received by ASCAP, or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license, and ASCAP shall, upon receipt of notice of the filing of such request, promptly give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the fee that it deems reasonable or requests additional information from the music user, and if the music user has not applied to the Court for a determination of a reasonable fee, ASCAP may apply to the Court for the determination of a reasonable fee retroactive to the date of a written request for a license and ASCAP shall upon filing such application promptly give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division.

   (B) In any such proceeding, the burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks except that, where a music user seeks a per-segment license, the music user shall have the burden of demonstrating that its performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP fee and of demonstrating that the music

## SPA-11

user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed.

(C) The fees negotiated by ASCAP and any music user during the first five years that ASCAP licenses music users in that industry shall not be evidence of the reasonableness of any fees (other than an interim fee as provided in Section IX(F) of this Second Amended Final Judgment) for any license in any proceeding under this Section IX.

(D) Should ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence.

(E) The parties shall have the matter ready for trial by the Court within one year of the filing of the application unless ASCAP and at least one music user request that the Court delay the trial for an additional period not to exceed one year. No other delay shall be granted unless good cause is shown for extending such schedule. Pending the completion of any such negotiations or proceedings, the music user shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Section IX(F) of this Second Amended Final Judgment, and to the final order or judgment entered by the Court in such proceeding.

(F) When a music user has the right to perform works in the ASCAP repertory pending the completion of any negotiations or pending proceedings provided for in Section IX(A) of this Second Amended Final Judgment, either the music user or ASCAP may apply to the Court to fix an interim fee pending final determination or negotiation of a reasonable fee. The Court shall then fix an interim fee within ninety (90) days of such application for an interim fee retroactive to the date of the written request for a license, allowing only such limited discovery, if any, that the Court deems necessary to the fixing of such interim fee. In fixing such interim fee, there shall be a presumption that the last

11

**SPA-12**

existing license (if any) between the music user and ASCAP, or between licensees similarly situated to the music user and ASCAP, sets forth the appropriate interim fee. If the Court fixes such interim fee, ASCAP shall then issue and the music user shall accept a license providing for the payment of a fee at such interim rate from the date of the request by such music user for a license pursuant to Section IX(A) of this Second Amended Final Judgment. If the music user fails to accept such a license or fails to pay the interim fee in accordance therewith, such failure shall be ground for the dismissal of its application for a reasonable fee, if any.

(G) When a reasonable fee has been determined by the Court, ASCAP shall be required to offer a license at a comparable fee to all other similarly situated music users who shall thereafter request a license of ASCAP; provided, however, that any license agreement that has been executed between ASCAP and another similarly situated music user prior to such determination by the Court shall not be deemed to be in any way affected or altered by such determination for the term of such license agreement.

(H) Nothing in this Section IX shall prevent any applicant or licensee from attacking in the aforesaid proceedings or in any other controversy the validity of the copyright of any of the compositions in the ASCAP repertory, nor shall this Second Amended Final Judgment be construed as importing any validity or value to any of said copyrights.

(I) Pursuant to its responsibility to monitor and ensure compliance with this Second Amended Final Judgment, the United States may participate fully in any proceeding brought under this Section IX. Any order or agreement governing the confidentiality of documents or other products of discovery in any such proceeding shall contain the following provisions:

    (1) The Department of Justice (the "Department") may make a written request for copies of any documents, deposition transcripts or other products of discovery ("products of discovery") produced in the proceeding. If the Department

12

## SPA-13

makes such a request to a party other than the party who produced the materials in the proceeding or to a deponent ("the producing party"), the Department and the party to whom it directed the request shall provide a copy of the request to the producing party. The producing party must file any objection to the request with the Court within thirty days of receiving the request; if the producing party does not file such an objection, the person to whom the Department directed its request shall provide the materials to the Department promptly;

(2) Any party to the proceeding may provide the Department with copies of any products of discovery produced in the proceeding. Any party who provides the Department with copies of any product of discovery shall inform the other parties to the proceeding within fifteen days of providing such materials to the Department. The producing party must file any objection to the production within fifteen days of receiving such notice; and

(3) The Department shall not disclose any products of discovery that it obtains under this order that have been designated as "confidential" in good faith or as otherwise protectable under Fed. R. Civ. P. 26(c)(7) to any third party without the consent of the producing party, except as provided in the Antitrust Civil Process Act, 15 U.S.C. §1313(c)-(d), or as otherwise required by law.

## X. Public Lists.

(A) Within 90 days of entry of this Second Amended Final Judgment, ASCAP shall, upon written request from any music user or prospective music user:

(1) Inform that person whether any work identified by title and writer is in the ASCAP repertory; or

(2) Make a good faith effort to do so if identifying information other than title and writer is provided.

(B) Within 90 days of entry of this Second Amended Final Judgment,

**SPA-14**

ASCAP shall:

(1) Make the public list available for inspection at ASCAP's offices during regular business hours, maintain it thereafter, and update it annually; and

(2) Make the public electronic list available through on-line computer access (*e.g.*, the Internet), update it weekly, make copies of it available in a machine-readable format (*e.g.*, CD-ROM) for the cost of reproduction, and update the machine-readable copies semi-annually.

(C) Beginning 90 days after entry of this Second Amended Final Judgment, the first written offer of a license that ASCAP makes to a music user or prospective music user shall describe how to gain access to the public list and public electronic list and describe the variety of works in the ASCAP repertory, including, but not limited to, a list of writers, genres of music and works that illustrates that variety.

(D) After the date on which ASCAP makes the public electronic list available pursuant to Section X(B)(2) of this Second Amended Final Judgment, ASCAP shall not institute or threaten to institute, maintain, continue, sponsor, fund (wholly or partially, directly or indirectly) or provide any legal services for, any suit or proceeding against any music user for copyright infringement relating to the right of nondramatic public performance of any work in the ASCAP repertory that is not, at the time of the alleged infringement, identified on the public electronic list; provided, however, that nothing in this Section X shall preclude ASCAP from pursuing its own *bona fide* independent interest in any such suit or proceeding. This Section X(D) shall not apply to any such suit or proceeding pending on the date of entry of this Second Amended Final Judgment.

XI. **Membership.**

(A) ASCAP is hereby ordered and directed to admit to membership, non-participating or otherwise:

(1) Any writer who shall have had at least one work regularly

14

## SPA-15

published, whether or not performance of the work has been recorded in an ASCAP survey; or

(2) Any person actively engaged in the music publishing business, whose musical publications have been used or distributed on a commercial scale for at least one year, and who assumes the financial risk involved in the normal publication of musical works.

(B) (1) ASCAP shall distribute to its members the monies received by licensing rights of public performance, less its costs, primarily on the basis of performances of its members' works (excluding those works licensed by the member directly) as indicated by objective surveys of performances periodically made by or for ASCAP, provided, however, that ASCAP may make special awards of its distributable revenues to writers and publishers whose works have a unique prestige value, or which make a significant contribution to ASCAP repertory. Distribution of ASCAP's distributable revenue based on such objective surveys shall reflect the value to ASCAP of performances in the various media, and the method or formula for such distribution shall be fully and clearly disclosed to all members. Upon written request of any member, ASCAP shall disclose in-formation sufficient for that member to determine exactly how that member's payment was calculated by ASCAP.

(2) Where feasible, ASCAP shall conduct, or cause to have conducted, a census or a scientific, randomly selected sample of the performances of the works of its members. Such census or sample shall be designed to reflect accurately the number and identification of performances and the revenue attributable to those performances, made in accordance with a design made and periodically reviewed by an independent and qualified person.

(3) ASCAP shall not restrict the right of any member to withdraw from membership in ASCAP at the end of any calendar year upon giving three months' advance written notice to ASCAP; provided, however, that any writer or publisher member who

15

**SPA-16**

resigns from ASCAP and whose works continue to be
licensed by ASCAP by reason of the continued membership
of a co-writer, writer or publisher of any such works, may
elect to continue receiving distribution for such works on the
same basis and with the same elections as a member would
have, so long as the resigning member does not license the
works to any other performing rights licensing organization
for performance in the United States. ASCAP may require a
written acknowledgment from such resigning member that the
works have not been so licensed.

(a) A resigning member shall receive distribution from ASCAP
for performances occurring through the last day of
the member's membership in ASCAP, regardless of the
date the revenues are received.

(b) ASCAP shall not, in connection with any member's resig-
nation, change the valuation of that member's works or
the basis on which distribution is made to that member,
unless such changes are part of similar changes
applicable to all members in the resigning member's
classification.

(c) Notwithstanding the foregoing, for any member who
resigns from ASCAP, ASCAP is enjoined and restrained
from requiring that member to agree that the withdrawal
of such works be subject to any rights or obligations
existing between ASCAP and its licensees, provided,
however, that ASCAP may make withdrawal of any works
from the ASCAP repertory subject to any license agree-
ment between ASCAP and any licensee that is in effect
on the date that this provision becomes effective.

(C) Each provision of Section XI(B) of this Second Amended Final
Judgment shall only be effective upon entry of an order in United
States v. Broadcast Music, Inc., No. 64 Civ. 3787 (S.D.N.Y.), that
contains a substantially identical provision. Until the provisions of
Section XI(B)(3) of this Second Amended Final Judgment become
effective, ASCAP shall not enter into any contract with a writer or

16

## SPA-17

publisher requiring such writer or publisher to grant to ASCAP performing rights for a period in excess of five years.

(D) Notwithstanding the provisions of Section XI(B)(3) and (C) of this Second Amended Final Judgment, a member who requests and receives an advance from ASCAP shall remain a member of ASCAP and shall not be entitled to exercise any right to resign until the advance has been fully recouped or repaid.

### XII. Plaintiff's Access.

(A) For the purposes of determining or securing compliance with this Second Amended Final Judgment or determining whether this Second Amended Final Judgment should be modified or terminated, and subject to any legally recognized privilege, authorized representatives of the Antitrust Division of the United States Department of Justice, shall upon written request of the Assistant Attorney General in charge of the Antitrust Division and on reasonable notice to ASCAP, be permitted:

  (1) Access during regular business hours to inspect and copy all records and documents in the possession, custody, or under the control of ASCAP, which may have counsel present, relating to any matters contained in this Second Amended Final Judgment;

  (2) To interview ASCAP's members, officers, directors, employees, agents, and representatives, who may have counsel present, concerning such matters; and

  (3) To obtain written reports from ASCAP, under oath if requested, relating to any matters contained in this Second Amended Final Judgment.

(B) ASCAP shall have the right to be represented by counsel in any process under this Section.

(C) No information or documents obtained by the means provided in this Section shall be divulged by the plaintiff to any person other than duly authorized representatives of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury

17

**SPA-18**

proceedings), or for the purpose of securing compliance with this Second Amended Final Judgment, or as otherwise required by law.

(D) If, at the time information or documents are furnished by defendant to plaintiff, ASCAP represents and identifies, in writing, the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and ASCAP marks each pertinent page of such material, "subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then 10-days notice shall be given by plaintiff to ASCAP prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which ASCAP is not a party.

XIII. **Dismissal of Individual Defendants.** This action is dismissed with respect to Gene Buck, George Meyer and Gustave Schirmer and their estates.

XIV. **Retention of Jurisdiction.** Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Second Amended Final Judgment to make application to the Court for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Second Amended Final Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof. It is expressly understood, in addition to the foregoing, that:

(A) The plaintiff may at any time after entry of this Second Amended Final Judgment, upon reasonable notice, apply to the Court for the vacation of said Judgment, or its modification in any respect, including the dissolution of ASCAP; and

(B) If, at any time after the entry of this Second Amended Final Judgment, a stipulated amended final judgment is entered in <u>United States v. Broadcast Music, Inc.,</u> No. 64 Civ. 3787(S.D.N.Y.), ASCAP may move the Court, and the Court shall grant such motion, to substitute the relevant terms of that stipulated amended final judgment for those of this Second Amended Final Judgment.

18

## SPA-19

XV. **Effective Date.** This Second Amended Final Judgment shall become effective three months from the date of entry hereof whereupon the Amended Final Judgment entered on March 14, 1950, all modifications or amendments thereto, the Order entered thereunder on January 7, 1960, and all modifications and amendments thereto (collectively the "Amended Final Judgment") and the Final Judgment in United States v. The American Society of Composers, Authors and Publishers, (formerly Civ. No. 42–245(S.D.N.Y.)) entered on March 14, 1950 and all modifications and amendments thereto (the "Foreign Decree") shall be vacated. This Second Amended Final Judgment shall not be construed to make proper or lawful or sanction any acts which occurred prior to the date hereof which were enjoined, restrained or prohibited by the Amended Final Judgment or the Foreign Decree.

Dated: June 11, 2001

William C. Conner

————————————————————
United States District Judge